*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-615

BRANDON ANDREWS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-16665-11)

(Hon. Robert E. Morin, Trial Judge)

(Argued February 26, 2015                    Decided October 22, 2015)

*Daniel Gonen*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Shana Fulton*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and STEADMAN, *Senior Judge*.

GLICKMAN, *Associate Judge*: This is a homicide case in which the accused,

appellant Brandon Andrews, claimed that he killed the decedent, Leonard Bigelow,

in self-defense. There was bad blood between the two because appellant had been

harassing Leonard Bigelow's sister, Katina Bigelow. In a previous encounter, Leonard allegedly pulled a knife on appellant and threatened to kill him if he would not leave Katina alone. Three days later, appellant called and told Leonard he was coming over to see Katina. Leonard responded that appellant was not welcome at their house and that if appellant showed up, he (Leonard) would be waiting for him. Appellant was not deterred; armed with a pistol, he went to the Bigelow residence. When he arrived on the street outside the house, Leonard allegedly charged at him with a knife, and appellant shot and killed him. Appellant maintained at trial that he went to see Katina for peaceful purposes, had every right to be where he was when Leonard attacked him, and had no choice but to shoot Leonard to save himself from a deadly attack.

The trial judge instructed the jury that one who deliberately puts himself in a position where he reasonably believes his presence will provoke trouble forfeits the right of self-defense, and that appellant could not rely on self-defense if he provoked Leonard Bigelow's alleged attack on him. Appellant contends on appeal that the evidence at trial did not justify this instruction. Under the settled law of this jurisdiction, however, we are bound to disagree with appellant's contention

and affirm his convictions for second-degree murder and the other offenses he committed in connection with the shooting.[1]

## I.

According to evidence at trial, the circumstances culminating in the charges against appellant were as follows. Appellant began dating Katina Bigelow in October 2010. She lived with her father, Lacey Bigelow, and her brother, Leonard Bigelow.[2] Lacey disliked appellant and barred him from the Bigelow home. Consequently, when appellant would go to meet Katina, he would not go inside her house, but instead would wait for her on the street. At some point during their relationship, appellant moved into a homeless shelter and started storing some of his clothing in Katina's car.

---

[1] Appellant also contends there was insufficient evidence to support his conviction on a charge of felony threats to do bodily harm, which was based on conduct prior to and separate from the shooting. For reasons we discuss below, we disagree with appellant on this issue too, and we therefore affirm his threats conviction.

[2] For clarity's sake, we shall refer to each of the Bigelows by their first names hereinafter.

By August 2011, Katina and appellant's relationship was falling apart. On August 22, they got into a heated argument while Katina was driving him somewhere. Appellant became so agitated and intimidating that Katina attempted to stop at a police station to request help. According to Katina, appellant discouraged her from doing so and told her that if she tried to do that again, she would die. Feeling "very scared," Katina then managed to pull over and secure the aid of police in removing appellant from her vehicle. That evening, he appeared outside her house. She did not go outside to speak with him and instead called the police. Appellant left before the police arrived. Later that night, he sent Katina several menacing text messages, which she did not answer.[3]

The next morning, appellant was waiting outside for Katina when she and Leonard left their house to take her daughter to school. Katina did not respond when he called out to her, but Leonard confronted appellant. Katina heard Leonard angrily tell appellant that she did not want to be with him. As the two men began to argue, Katina went back in the house to call the police. According to appellant, Leonard displayed a knife and threatened to kill him when he tried to speak to

---

[3] Appellant was acquitted of threats charges based on the incident in the car and this set of text messages.

Katina.[4]  Appellant told him to fight him "like a man."  Appellant then departed. Later in the day, Katina went to court to obtain a stay-away order.  (The order was never served on appellant, however.)

Throughout the rest of that day, Katina did not answer appellant's repeated phone calls and text messages.  The following night, after further unsuccessful attempts by appellant to communicate with her, Katina texted back that she was ignoring him "[b]ecause of the threats that you have said to me.  I don't want to be in this relationship anymore so can you please stop calling and texting me."  In a series of subsequent text messages, appellant pressed Katina to return the clothing he had left in her car.  She texted back that she would get his belongings to him as soon as she could.

At 8:00 on the morning of August 26, Katina drove to the homeless shelter where appellant was staying in order to drop off his clothing.  On her way, she texted him to let him know she had his things with her.  When she arrived, Katina saw appellant standing near the shelter at the corner of 2nd and E Streets

---

[4] Appellant testified that Katina was present when Leonard threatened him with the knife, but Katina denied hearing any threats or seeing either man wield a weapon.

Northwest. To avoid interacting with him in person, she left his belongings at the bus stop on the corner of 3rd and E Streets and sent him a text message as she drove away, at 8:16 a.m., to let him know they were there. This elicited an angry reaction from appellant, who (as he testified at trial) saw people rifling through his belongings before he could get to them. Appellant sent Katina the following series of text messages, on which his conviction of felony threats to do bodily harm was based (Katina's sole response is shown in italics):

| | |
|---|---|
| 8:18 a.m. | "You better get my shit." |
| 8:20 a.m. | "I swear to god I will fuck your car up." |
| 8:22 a.m. | "You don't do people stuff like that." |
| 8:26 a.m. | "Your car will be fucked. Up." |
| 8:26 a.m. | "It's on now I wouldn't do it to you like that." |
| 8:28 a.m. | "You done fucked up now you stupid bitch." |
| 8:30 a.m. | "That's your ass." |
| 8:35 a.m. | "I can't wait till you get home." |
| 8:36 a.m. | "You owe me." |
| 8:49 a.m. | "That shit is staying [where] it's at you owe me." |
| 9:49 a.m. | [Katina:] *"My apologies, That was the only way that I could get it to you without seeing you. That's definitely not something I wanted to do. I just wanted you to have your belonging so I can move on."* |
| 9:53 a.m. | "Someone went through the bags you owe me." |
| 9:54 a.m. | "I left the bag [where] it was." |
| 9:57 a.m. | "I want some money today for my personal belongings." |
| 10:00 a.m. | "Did you get that." |
| 10:26 a.m. | "You ignoring me." |

Katina testified that she felt "scared" when she received these messages and uncertain what appellant meant to do. Other than texting him her apology quoted above, she took no immediate action. Later that day, though, appellant and Katina spoke on the phone and he demanded she pay him $1,000 or $1,500 for the clothing he had lost. At trial, appellant testified that Katina agreed to compensate him; she could not remember whether she did so.

At 9:37 p.m. (as indicated by phone records), appellant called the Bigelow house. Leonard answered the phone. Appellant said he would be coming over to the house around 10:00 p.m. and asked to speak to Katina. Katina heard Leonard tell appellant, in a raised voice, "she don't want to talk to you," "I'll meet you outside on the porch," and "You come on around here and I'll be waiting for you."[5] When Leonard got off the phone, he informed Katina that her "boyfriend" would be coming at 10 o'clock. She responded that appellant was not her boyfriend but expressed no concern about his impending visit. She did not think to call the police at this point.

---

[5] Appellant testified that Leonard told him Katina did not want to speak to him. He did not remember what else Leonard said to him in their phone conversation.

A few minutes later, at 9:43 p.m., appellant texted Katina to tell her, "I'm coming to the house." He arrived shortly before 11:00 p.m.[6] Katina and her father, Lacey, were out on the front porch. When Katina saw appellant approaching the house, she ran inside to tell Leonard and to call 911. Leonard ran past Katina and out the front door onto the porch. When Leonard exited the house, appellant was on the sidewalk in front of the Bigelow residence.

At this point, one of two things happened. Katina and Lacey testified that they saw appellant raise his arm and shoot Leonard. They said Leonard was unarmed and standing on the porch when he was shot. According to Lacey, no words were exchanged between the two men. Appellant, however, testified that Leonard came off the porch and charged at him in a threatening manner, holding an unknown object in his hand that appellant thought was a knife. Appellant said he drew his weapon and fired two shots in self-defense when Leonard was within three feet of him.

One of appellant's bullets hit Leonard in the chest. He turned back and fell dead in front of the door to his house. Appellant left the scene immediately. A

---

[6] Appellant testified that he delayed his arrival in the hope that Leonard would have left the house to spend the night with his girlfriend.

neighbor who looked out his window when he heard gunshots and screaming saw appellant walking "calmly" down the street.

When the police arrived, they found a switchblade and a butcher's knife on the front porch. Lacey and Katina testified that Leonard used the knives for fishing; Katina said he often carried a knife on his person.

Appellant was arrested the next day. He had a handgun in his possession. He told the police he shot Leonard with it in self-defense.

Appellant was found guilty of second-degree murder while armed; assault with a deadly weapon ("ADW"), based on the fact that Lacey was in the line of fire (though he had not been hit); two counts of possession of a firearm during a crime of violence ("PFCV") associated with the murder and the ADW, respectively; other firearm possessory offenses; and one count of felony threats to commit bodily injury, based on the text messages appellant sent Katina after she dropped off his belongings on the morning of August 26.

## II.

Adapting the language of the pattern "Redbook" instruction on the subject,[7] the trial judge instructed the jury that "[o]ne who deliberately puts himself in a position where he reasonably believes that his presence will provoke trouble cannot claim self-defense," and that if appellant "provoked the conflict upon himself," he could not rely on self-defense to justify his use of force against Leonard Bigelow. Appellant contends it was error to give this instruction because there was no evidence he provoked Leonard to attack him; the government disagrees.[8] The sufficiency of the evidence to support the instruction is a question of law, as to which our review is *de novo*.[9]

The challenged instruction comported with the proposition, now well-entrenched in our case law, that "[s]elf-defense 'is not available to one who finds

---

[7] *See* Criminal Jury Instructions for the District of Columbia, No. 9.504(A) (5th ed. 2015).

[8] Appellant objected to the provocation instruction at trial, albeit without explaining why. We treat the objection as sufficient to preserve an argument challenging the sufficiency of the evidence to justify giving the instruction.

[9] *Appleton v. United States*, 983 A.2d 970, 977 (D.C. 2009).

trouble by going out of his way to look for it.'"[10]  "The fact that the deceased struck the first blow, fired the first shot or made the first menacing gesture does not legalize the self-defense claim if in fact the claimant was the actual provoker."[11]  A legitimate claim of self-defense is not available to a defendant who voluntarily—knowingly and unnecessarily—placed himself in a position where he had reason to believe his presence would provoke the violence from which he then found it necessary to use deadly force to save himself.[12]

As the forfeiture-of-self-defense-by-provocation doctrine has developed in this jurisdiction, the government is not required to prove that the defendant acted with the intent to provoke his adversary to violence.[13]  Forfeiture ensues, we have

---

[10] *Nowlin v. United States*, 382 A.2d 9, 14 n.7 (D.C. 1978) (quoting R. Perkins, *Criminal Law* 1008 (2d ed. 1969)).

[11] *Rorie v. United States*, 882 A.2d 763, 772 (D.C. 2005) (quoting *United States v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973)).

[12] *Sams v. United States*, 721 A.2d 945, 953 (D.C. 1998) (citing, *inter alia*, *Howard v. United States*, 656 A.2d 1106, 1111 (D.C. 1995)).  It is immaterial that the person provoked was not justified in resorting to violence and was criminally liable for assault himself.

[13] *Sams*, 721 A.2d at 952 ("That is not and has never been the law in the District of Columbia.").  *Sams* traces this aspect of the doctrine, and the jury instruction used in appellant's case, back to *Laney v. United States*, 294 F. 412 (D.C. Cir. 1923).  The defendant in that case was a black man fleeing a lynch mob during a race riot.  After escaping the mob by hiding in the back yard of a nearby

*(continued…)*

held, even if the defendant's "purpose in putting himself in that position [where his presence would trigger violence] was benign,"[14] and even if the area of confrontation was a public street or other place where the defendant had a right to be present.[15] Rather, this jurisdiction's rule is that "if one has reason to believe

---

*(continued…)*
house, Laney made the mistake of leaving his position of (relative) safety while the mob was still rampaging, in order to go to work. On returning to the street, Laney exposed himself again to the mob, and its members resumed shooting at him. To protect himself, Laney fired back, killing one of his assailants. His conviction for manslaughter was affirmed on appeal.

Other jurisdictions, in accord with the Model Penal Code, have required (*contra Laney*) that the putative provocateur must be shown to have intended to instigate or promote violence. *See, e.g.*, *State v. Hawkins*, 563 A.2d 745, 749 (Conn. App. 1989) (holding that the provocation exception to the right to use force in self-defense "carries with it the requirement that the actor act with the specific intent to elicit the use of physical force by another person in order to cause physical injury or death to that person by, for example, retaliating with force against that person"); Model Penal Code § 3.04(2)(b)(i) (use of deadly force not justifiable when the defendant, "with the purpose of causing death or serious bodily injury, provoked the use of force against himself in the same encounter"). It has been suggested that the District of Columbia is an outlier in not requiring proof of intent to incite violence as a component of its provocation doctrine. But whether or not we might think such a requirement to be desirable, it is not open to a division of this court to adopt it in contravention of governing precedent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). We note also that appellant did not request the trial court to instruct the jury that the government needed to prove he intended to provoke Leonard's attack on him.

[14] *Sams*, 721 A.2d at 953.

[15] *See Mitchell v. United States*, 399 A.2d 866, 869 (D.C. 1979) ("Our belief is in no way diminished by the fact that the position in which appellant placed himself was on a city street to which the public was generally welcome. A
*(continued…)*

that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so."[16] The rationale underlying this stern doctrine lies in "the fundamental principle that a killing in self-defense is excusable only as a matter of genuine necessity. Quite obviously, a defensive killing is unnecessary if the occasion for it could have been averted[.]"[17] In short, "one cannot support a claim of self-defense by a self-generated necessity to kill."[18]

Where a defendant claims to have acted in self-defense and there is sufficient evidence to support a self-defense instruction, the burden is on the government to disprove self-defense beyond a reasonable doubt.[19] Thus, assuming, *arguendo*, that Leonard Bigelow was the first aggressor, the issue before us comes down to whether the jury permissibly could have found, beyond a reasonable doubt on the evidence before it, that appellant deliberately provoked the

---

*(continued…)*
person's presence on a public street under similar circumstances has been found trouble-provoking and hence contrary to his claim of self-defense.") (citing cases).

[16] *Tyler v. United States*, 975 A.2d 848, 858 (D.C. 2009) (quoting *Laney*, 294 F. at 414).

[17] *Peterson*, 483 F.2d at 1231.

[18] *Id.*

[19] *Rorie v. United States*, 882 A.2d 763, 771-72 (D.C. 2005).

fatal conflict by going to Leonard's home on the night of August 26. If so, it was proper for the trial judge to instruct the jury on provocation.

We hold that the evidence at appellant's trial amply justified the instruction. According to appellant's own testimony, just three days before their fatal clash, Leonard pulled a knife on him and threatened to kill him if he did not leave Katina alone. Appellant argues that he disengaged from this altercation, and that having done so, he did not forfeit his right to defend himself from a deadly attack "by merely going someplace where he might encounter someone he had an argument with days earlier."[20] That argument overlooks the intervening events and misrepresents the nature of the final confrontation. Despite Leonard's threat to kill him, appellant continued to pester Katina, and on the night of August 26, he told Leonard that he was coming to see her. In response, as Katina testified, Leonard warned appellant that he would be waiting for him. This was no friendly invitation—the jury could find it was a renewed threat by Leonard of physical violence, and that appellant (who professed to have been hoping Leonard would be gone by the time he got there) understood it as such. Yet immediately after

---

[20] Brief for Appellant at 29.

Leonard delivered this warning, appellant texted Katina to confirm that he was on his way to see her.

Leonard's response to appellant's August 26 phone call put appellant on notice that if he came to the Bigelow residence that night to see Katina, he would have to go through Leonard first.[21] Appellant chose to disregard the risk. The jury could infer from the fact that appellant brought a loaded gun with him that he foresaw he was about to face a grave danger and prepared to meet it head-on. Moreover, while appellant understandably may have been upset over the loss of his belongings and intent on obtaining compensation from Katina, the jury could find that he easily could have avoided the fatal encounter with Leonard by refraining from going to Leonard's house that night.

From all this evidence, the jury readily could have found that appellant deliberately chose to risk a deadly confrontation with Leonard by placing himself in a position where his presence would be likely to provoke exactly that—and that appellant thereby forfeited his right to claim self-defense even if he had a

---

[21] *Cf. Nowlin*, 382 A.2d at 14 n.7 (holding that the accused, by going to the victim's home after the victim had threatened him, "had no legitimate claim to the defense of self-defense, since he had voluntarily placed himself in a position which he could reasonably expect would result in violence").

legitimate reason to want to speak with Katina, and even if Leonard was at fault for being the initial aggressor.[22]

## III.

Appellant's conviction for threatening to "injure the person" of Katina Bigelow in violation of D.C. Code § 22-1810 (2012 Repl.) was based on the text messages he sent her on the morning of August 26 after she left his belongings at the bus stop. Appellant argues that his text messages threatened only her car, not her person, and that the evidence therefore was insufficient to support his

---

[22] Appellant additionally argues that the provocation instruction was inappropriate because, even if he did provoke a confrontation, Leonard's reaction was disproportionate to the provocation; that it was unforeseeable, in other words, that Leonard would employ (as appellant allegedly perceived) more than non-deadly force against him. Actually, given appellant's testimony that Leonard had threatened to kill him with a knife three days earlier, and that appellant armed himself with a handgun, his claim that the danger of a deadly clash was unforeseeable is dubious. Nor is it entirely clear that a provocateur, like a first aggressor, may regain the right of self-defense if his adversary unjustifiably escalates the (reasonably anticipated) level of violence by employing deadly force. But even assuming the validity of that proposition and its applicability to this case, that does not mean there was insufficient evidence for the provocation instruction. At most, it means only that appellant might have been entitled to some sort of escalation instruction had he requested one—which he did not do. *See Montgomery v. United States*, 384 A.2d 655, 660 (D.C. 1978) ("[A] defendant is entitled to an instruction on his theory of the case when properly requested by counsel and when the theory is supported by any evidence.").

conviction of the charged offense.[23]  Viewing the evidence, as we must, in the light most favorable to sustaining the jury's verdict,[24] we disagree with appellant.

Evidence is sufficient to sustain a conviction so long as "*any* rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt."[25]  While sufficiency-of-the-evidence review is not "toothless," it necessarily is "deferential . . . 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"[26]

To prove threats to do bodily harm in violation of D.C. Code § 22-1810, the government must prove, *inter alia*, that the defendant's "words were of such a

---

[23] While it also is a violation of § 22-1810 to threaten physical damage to another's property, the indictment did not charge such a violation, and the jury consequently was instructed that the government had to prove appellant threatened harm to Katina herself.

[24] *See Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

[25] *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original)).

[26] *Id.* (quoting *Jackson*, 443 U.S. at 319).

nature as to convey fear of bodily harm or injury to the ordinary hearer."[27] The words in question "must be considered in the context in which they were used."[28] The reference to the "ordinary hearer" does not mean the actual hearer's situation and reaction are irrelevant, for "the ordinary hearer we posit is one aware of all the surrounding circumstances, including what the actual hearer knew."[29] While the government does not need to prove that the actual hearer felt threatened,[30] the actual hearer's fear, or lack thereof, "may be probative as to whether the utterance, in the circumstances, was such as to convey fear of bodily injury to the 'ordinary

---

[27] *Joiner-Die v. United States*, 899 A.2d 762, 764 (D.C. 2006); *see also Postell v. United States*, 282 A.2d 551, 554 (D.C. 1971) ("the serious promise of bodily harm or death"). There remains an unresolved conflict in our cases as to whether the utterance must threaten *serious* bodily harm (as opposed to bodily harm of any magnitude) in order to be criminally actionable. *See Aboye v. United States*, No. 13-CM-1219, 2015 D.C. App. LEXIS 360, at *12 n.18 (D.C. Aug. 6, 2015). Appellant's sufficiency challenge does not implicate this issue, however.

We also note that this court has granted a petition for rehearing en banc in *Carrell v. United States*, 80 A.3d 163 (D.C. 2013), to consider the *mens rea* element of the offense of threats. That issue, too, is not before us in the present appeal.

[28] *Jenkins v. United States*, 902 A.2d 79, 85 (D.C. 2006); *see also, e.g., Lewis v. United States*, 95 A.3d 1289, 1291 (D.C. 2014) ("Our cases have stressed that the context in which words are spoken is critical and that the circumstances and the relations between the parties may be taken into consideration.") (internal quotation marks and ellipses omitted).

[29] *Gray v. United States*, 100 A.3d 129, 134-35 (D.C. 2014).

[30] *Id.* at 135 (citing *Postell*, 282 A.2d at 554).

hearer.'"[31]   As this court observed in *Gray*, "evidence about an actual person's response to a situation is evidence, sometimes the best evidence available, of how a reasonable person would have responded under the circumstances."[32]

Appellant emphasizes that while his August 26 text messages certainly were hostile, and two of them undeniably threatened damage to Katina's car,[33] they contained no explicit threat of any kind to Katina's person.  That is not dispositive, however.  A threat can be conveyed by "innuendo or suggestion,"[34] and by words that appear ambiguous or even innocuous on their face.[35]  There may be all the more reason to construe an ambiguous statement as threatening when it is made "in the context of a volatile or hostile relationship."[36]  Thus, the government argues, an

---

[31] *Aboye*, 2015 D.C. App. LEXIS 360, at *14 n.22.

[32] 100 A.3d at 135.

[33] The text message at 8:20 a.m. read, "I swear to god I will fuck your car up."  It was followed at 8:26 a.m. by a text message reading, "Your car will be fucked.  Up."

[34] *Clark v. United States*, 755 A.2d 1026, 1031 (D.C. 2000).

[35] *See, e.g.*, *Jenkins*, 902 A.2d at 86-87 (holding that the defendant's angry demands that victim "open the door" and "come out" were sufficient to support her threats conviction where she was kicking the victim's door while uttering them and she had threatened to kill the victim three weeks earlier).

[36] *In re S.W.*, 45 A.3d 151, 157 (D.C. 2012).

ordinary hearer in Katina's circumstances reasonably could interpret the messages "You done fucked up now you stupid bitch," "That's your ass," and "I can't wait till you get home," as threatening her person, even if those messages were ambiguous and did not overtly threaten any action at all.

Considering the context, we think the government has the better of the argument. Appellant's words may have been ambiguous, but they were susceptible to the meaning the government ascribes to them. They were angry and menacing. The jury could find them to have been part of a pattern of hostility and intimidation: Within the preceding few days, appellant had stalked Katina, had heated confrontations with both her and her brother, and had threatened her to her face with death if she tried again to call on the police for help. And when Katina was asked at trial how she felt when she received appellant's August 26 text messages, she testified that they made her scared and anxious. Appellant's rejoinder, that Katina could not have felt endangered by his text messages since she did not call the police, is less than convincing given appellant's then recent threat to kill her if she did just that.

We conclude that a reasonable jury could find, beyond a reasonable doubt, that appellant's text messages on August 26 were of such a nature as to convey fear of bodily harm or injury to an ordinary hearer in Katina's circumstances.

**IV.**

For the above-stated reasons, we hold that the trial court did not err by instructing the jury that appellant forfeited his right to claim self-defense if he provoked Leonard Bigelow to attack him, and that there was sufficient evidence for the jury to find appellant threatened Katina Bigelow with bodily harm in his August 26 text messages. Accordingly, we affirm appellant's convictions and remand the case for the Superior Court to address merger issues.[37]

*So ordered.*

---

[37] Appellant's convictions on the two counts of PFCV merge, requiring that one of them be vacated on remand. *See Heath v. United States*, 26 A.3d 266, 285 n.65 (D.C. 2011) ("The government agrees that because it proved a 'single possession of a single weapon during a single violent act,' the two [PFCV] convictions merge.") (quoting *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999)).