# District of Columbia
# Court of Appeals

**No. 13-CF-1133**

DOMINIQUE BASSIL,

Appellant,



F I L E D

OCT - 6 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CF1-15572-11**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge*; GLICKMAN, *Associate Judge*; and BELSON, *Senior Judge*.

**J U D G M E N T**

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's convictions are affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: October 6, 2016.

Opinion by Associate Judge Stephen H. Glickman.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1133

DOMINIQUE BASSIL, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED  10/6/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF1-15572-11)

(Hon. Robert E. Morin, Trial Judge)

(Argued: September 29, 2015                    Decided: October 6, 2016)

*Jaclyn S. Frankfurt*, Public Defender Service, with whom *James Klein* and *Christine A. Monta*, Public Defender Service, were on the brief, for appellant.

*L. Jackson Thomas*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Michelle D. Jackson*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and BELSON, *Senior Judge*.

GLICKMAN, *Associate Judge*: Shortly after 2 a.m. on August 13, 2011, Dominique Bassil fatally stabbed her boyfriend, Vance Harris, in the kitchen of their apartment. There were no other witnesses to the encounter. Although Bassil

told police and testified at her trial that she acted in self-defense, the jury convicted her of murder in the second degree while armed. On appeal, Bassil contends there was insufficient evidence at trial to disprove her claim of self-defense. She argues that no witnesses or other evidence contradicted her account, and that even if the jury did not find her credible, mere disbelief of a witness's testimony cannot justify a finding that the opposite is true. In response, the government argues that there was ample evidence permitting the jury to find beyond a reasonable doubt that Bassil did not stab Harris in self-defense. Viewing the evidence, as we must, in the light most favorable to sustaining the jury's verdict, we agree with the government and affirm appellant's conviction.

## I. Governing Legal Principles

The principles of law governing our consideration of appellant's contention are best set forth at the outset to frame our discussion. To find appellant guilty of second-degree murder, the jury must have been persuaded beyond a reasonable doubt that she killed Harris with "malice aforethought,"[1] a "term of art embodying several distinct mental states" including "specific intent to kill," "specific intent to

---

[1] D.C. Code § 22-2103 (2012 Repl.).

inflict serious bodily harm," or "wanton and willful disregard of an unreasonable human risk."[2] The absence of justification, excuse, or mitigation is "an essential component" of malice aforethought; the government therefore bore the burden of disproving appellant's claim that she killed Harris in justified self-defense.[3]

"[A] killing in self-defense is excusable only as a matter of genuine necessity."[4] Appellant therefore was justified in stabbing Harris in self-defense provided that (1) she honestly believed she was in imminent danger of serious bodily harm or death, and that she needed to use deadly force to save herself from that danger; and that (2) both those beliefs were objectively reasonable under the circumstances.[5] In addition, even if those conditions were met, appellant would not be able to justify the stabbing as self-defense if (3) she was the first aggressor or (4) she provoked Harris to attack her, unless she thereupon withdrew in good

---

[2] *Comber v. United States*, 584 A.2d 26, 38-39 (D.C. 1990) (en banc).

[3] *Id.* at 41 & n.17 ("[T]he government's obligation to disprove justification, excuse, or mitigation arises only when there is some evidence of one or more of these circumstances in the case.").

[4] *Andrews v. United States*, 125 A.3d 316, 322 (D.C. 2015) (quotation omitted).

[5] *See Richardson v. United States*, 98 A.3d 178, 187 (D.C. 2014); *see also* Criminal Jury Instructions for the District of Columbia, Nos. 9.500—9.502 (5th ed. rev. 2015).

faith and communicated her withdrawal to Harris.[6]  So long as there was some evidence from which a reasonable fact finder could conclude that appellant acted in justifiable self-defense, she was entitled to the jury instruction.  It was not appellant's burden to prove her claim.  Rather, as the jury was instructed, the burden was on the government to disprove it.  Thus, to defeat appellant's claim of self-defense and secure a conviction, the government needed to disprove at least one of the four aforementioned conditions beyond a reasonable doubt.[7]

---

[6] *See Swann v. United States*, 648 A.2d 928, 930 n.7 (D.C. 1994) (noting that even when the other conditions of a self-defense claim are satisfied, "a defendant cannot claim self-defense if the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself") (internal quotation marks omitted); *see also Andrews*, 125 A.3d at 321 ("A legitimate claim of self-defense is not available to a defendant who voluntarily – knowingly and unnecessarily – placed himself in a position where he had reason to believe his presence would provoke the violence from which he then found it necessary to use deadly force to save himself."); *Rorie v. United States*, 882 A.2d 763, 772 (D.C. 2005) ("[T]he fact that a defendant may have been an aggressor or a provocateur at an earlier point in time[] does not by itself rule out a defense of self-defense . . . . where there is evidence of a disengagement due to the passage of time" sufficient to restore the combatants to "the *status quo ante*.") (internal quotation marks and citation omitted); *see also* Criminal Jury Instructions, *supra* note 5, No. 9.504.

[7] Mitigating circumstances sufficient to reduce the homicide from murder to voluntary manslaughter exist when a defendant acted in so-called "imperfect" self-defense – typically when the defendant honestly believed she needed to use lethal force to protect herself, but the belief was not objectively reasonable or the defendant was responsible for starting or triggering the violence. *See Swann*, 648 A.2d at 930-33; *see also Richardson*, 98 A.3d at 187 n.11.  The jury in this case was instructed on this point and its option to find appellant guilty of voluntary manslaughter as a lesser-included offense of second-degree murder.

On appeal, this court "must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt.'"[8] Sufficiency-of-the-evidence review therefore is "deferential . . . to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[9] "The evidence need not 'compel a finding of guilt' or negate 'every possible inference of innocence.'"[10] But we "take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt."[11] Although "[a] jury is entitled to draw a vast range of reasonable

---

[8] *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original)).

[9] *Id.* (quoting *Jackson*, 443 U.S. at 319); *see also, e.g.*, *Medley v. United States*, 104 A.3d 115, 127 n.16 (D.C. 2014) ("When analyzing the sufficiency of the evidence, we view the evidence 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'") (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

[10] *Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015) (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000)).

inferences from evidence, [it] may not base a verdict on mere speculation. The evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation."[12]

Our obligation to view the evidence in the light most favorable to the prosecution almost always "commands that we assume that the jury in its assessment of credibility did not believe [the defendant's] exculpatory testimony, and we must defer to the jury's prerogative in this area."[13] That does not mean we will sustain a verdict relying on an inference from mere disbelief of a witness that *the opposite* of the discredited testimony is the truth. Often it may be illogical and hence impermissible to draw such an inference. "When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited

---

*(continued…)*

[11] *Rivas*, 783 A.2d at 134.

[12] *Id.* (punctuation and internal citations omitted) (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990), and *Curry*, 520 A.2d at 263).

[13] *Cosby v. Jones*, 682 F.2d 1373, 1382 (11th Cir. 1982 ).

testimony is not considered a sufficient basis for drawing a contrary conclusion."[14]

Hence it is generally agreed that "a jury may not use the disbelief of a witness's testimony as *exclusive* proof of a fact of an opposite nature or tendency."[15] In a criminal appeal, therefore, we will not fill a gap in the evidence and deem it sufficient by positing that the fact finder could have drawn an uncorroborated "negative inference" from testimony of the defendant that, though not credited, was neither contradicted, nor inherently inconsistent or implausible, nor otherwise demonstrably undermined in the record before us.[16]

We acknowledge, however, that "disbelief of a defendant's testimony can, in limited circumstances, give rise to a positive inference of guilt"[17] sufficient, either by itself or, especially, in conjunction with other, affirmative evidence in the

[14] *Evans-Reid v. District of Columbia*, 930 A.2d 930, 940 (D.C. 2007) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)).

[15] *Id.* (emphasis added).

[16] *See Hector v. United States*, 883 A.2d 129, 134 (D.C. 2005) ("We reject the notion that a fact finder can permissibly draw a negative inference from such testimony, even if discredited, sufficient by itself to sustain a conviction."); *accord Price v. United States*, 985 A.2d 434, 439 (D.C. 2009) ("[W]e will not sustain a conviction that necessarily relies on negative inferences drawn from testimony that is neither implausible, nor inconsistent, even if it is discredited.").

[17] *Hector*, 883 A.2d at 134 (citing *Stallings v. Tansy*, 28 F.3d 1018, 1023 (10th Cir. 1994) (surveying federal appellate decisions)).

record, to support a conviction. For example, if the jury reasonably concludes that the defendant is not merely unreliable, but is lying about material facts, it permissibly may infer that the truth is contrary to the defendant's testimony and incriminating, for a false exculpatory statement (or other evasion) permits the finder of fact to "infer consciousness of guilt, and therefore guilt itself."[18] The incriminating falsity of a defendant's exculpatory testimony may be demonstrated to the jury in various ways that will be visible to an appellate court from the record of the trial.[19] The testimony may be so internally inconsistent or implausible on its

---

[18] *In re G.H.*, 797 A.2d 679, 684 (D.C. 2002); *see also Mills v. United States*, 599 A.2d 775, 783-84 (D.C. 1991) ("[I]t has always been understood – the inference, indeed, is one of the simplest in human experience – that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence . . . , and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.") (quoting II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979)); *Irick v. United States*, 565 A.2d 26, 30 n.8 (D.C. 1989) ("False exculpatory statements made to law enforcement officers constitute independent circumstantial evidence of guilty consciousness.") (internal citations omitted).

[19] *Cf. Evans-Reid*, 930 A.2d at 940-41 ("[A]lthough a witness's demeanor alone may rationally justify a finding opposite to the witness's testimony in court, the theory would not be countenanced on the policy ground that there could be no effective appellate review of a trial judge's decision to permit an issue to go to the jury on the basis of witness demeanor alone.") (citing *Dyer v. MacDougall*, 201 F.2d 265, 269 (2nd Cir. 1952)).

face that it virtually compels the inference that the defendant is fabricating and hence guilty.[20] Even when the defendant's story on the witness stand is not self-contradictory or patently incredible, prior inconsistent statements by the defendant or other conflicting evidence at trial may be enough to support the jury's "negative inference" of guilt from its disbelief of the defendant. Evidence of motive or bias may serve in a similar capacity by enabling the jury to find that the defendant's testimonial explanation is pretextual: "[b]ias, in the sense of animus against the [victim], can be used to infer motivation to commit the ultimate injurious act that gives rise to liability sufficient to carry the [government's] burden."[21] Where a jury has rational grounds to reject a defendant's exculpatory claim as false, it may infer that the truth is inculpating.[22]

---

[20] *See United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir. 1984) ("[W]holly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge.").

[21] *Evans-Reid*, 930 A.2d at 942. *Evans-Reid* was a civil case, but the principle applies in criminal cases as well, subject to the heightened beyond-a-reasonable-doubt proof requirement in those cases.

[22] *See id.*

## II. The Evidence at Trial

At around 2:00 a.m. on August 13, 2011, appellant returned to her apartment with her boyfriend, Vance Harris. The couple had a stormy relationship and they had been quarreling earlier that evening and on their way home. About half an hour after they arrived there, appellant, half-naked and holding a large kitchen knife, fled the apartment. She ran down the stairs and out of the building to a security booth, where she told the guard – and later the police – that Harris had assaulted her and she had stabbed him in self-defense. Taken into custody, appellant repeated this claim to homicide detectives in a recorded interview, during which she learned that Harris's stab wounds were fatal.

The issue in dispute at appellant's trial was not whether she stabbed and killed Harris, but why. Appellant continued to assert that she acted in self-defense, testifying that she loved Harris and did not want to stab him, but did so because he had attacked her and she was scared. To disprove this, the prosecution impeached and contradicted appellant's account of the incident and sought to show she stabbed Harris out of the "rage, jealousy, and anger" that his disrespect, indifference, and rejection had aroused in her.

*Background Evidence: Appellant's Relationship History with Harris, and the Days and Hours Preceding the Stabbing*

The prosecution undertook to establish appellant's motive for stabbing Harris with evidence of her long-standing grievances against him and her temperament and behavior in the hours immediately preceding the homicide. In the process, the jury learned a great deal about a tempestuous and often acrimonious (though non-violent[23]) relationship marked by Harris's chronic infidelity, neglect of appellant, and indifference to her devotion to him and desire for him to change. Appellant, who was in love with Harris and had tattooed his name on her body, was frequently rebuffed and humiliated, but she repeatedly forgave or tolerated Harris's unfaithfulness and sought his forgiveness for her angry outbursts. Their relationship did not improve, however.

About three weeks before the homicide, appellant, upset that Harris spent his money to take a trip without her to Miami instead of contributing to the rent, called him while he was there to say she was putting his belongings out on the curb. She

---

[23] Neither appellant nor the prosecution characterized Harris as having mistreated her physically. On the contrary, appellant acknowledged in her testimony at trial that Harris had not been physically abusive.

texted him that "life will only get even more miserable if you're even thinking about fucking with me." When Harris returned from Miami, she gave him an ultimatum to move out of her apartment in two weeks (though he did not do so, and it appears she relented). On August 1, 2011, twelve days before the stabbing, appellant sent another text to Harris, in which she said, "I'm gonna fuck you up if you don't stop playing with me. . . . You keep fucking playing with me. . . . Don't manage to get anyone killed today along with yourself." Yet in other communications, appellant wrote of missing Harris and apologized to him for "acting in [] poor behavior." On July 22, 2011, appellant described her feelings to Harris as follows: "[S]ometimes I feel like when I'm not with you I lose you and I'm very selfish when it comes to my love . . . for you. Please accept my apology and love me like never before. I want to see a doc or DR, so I can't [sic] learn how not to be so jealous and selfish when I can't have my way."

On the night of August 12, 2011, appellant and Harris were guests at a wedding reception. Several witnesses who observed them there testified at trial to appellant's unhappiness and annoyance with Harris, who was a groomsman and in a jovial mood. While he had a good time and danced with other women, appellant followed him around "almost like a shadow" and tried in vain to get his attention. Harris avoided and laughed at her. Later in the evening, appellant yelled at Harris,

called him names, and "mushed" and smacked his face in front of other wedding guests. But Harris did not respond aggressively and was still in good spirits when he finally bid his friends good night and headed home with appellant.

They argued while on their way. In Capitol Heights, Maryland, two police officers came upon them and found appellant sitting on the sidewalk outside Harris's truck. One of the officers testified at trial that appellant was "loud, excitable and appeared to be agitated," while Harris was "cool, calm and collected." The other officer, who spoke with appellant after she and Harris were separated, reported that appellant became upset and started crying when asked what had happened. Concluding that appellant and Harris were only having a verbal argument, the officers persuaded them to get back in the truck and go home. Surveillance footage admitted at trial showed them arriving there at around 2:00 a.m. Appellant walked on ahead of Harris without waiting for him or holding the door for him. In her testimony at trial, appellant said she acted this way because she was still upset with Harris.

*Appellant's Pretrial Statements Explaining the Stabbing*

The first person appellant encountered after the stabbing was her building's security guard. The guard testified that she came into his booth and told him to

call an ambulance or the police. According to the guard, appellant said her six-foot eight-inch tall boyfriend "was beating on her" and she stabbed him. She also told the guard she was not hurt.

The guard called the police. One of the officers who responded testified from notes he made at the scene that appellant told him she went to bed when they got home before Harris "came in the room and started . . . hitting me in the face and neck." According to the officer's contemporaneous notes, appellant said Harris "grabbed me by my feet and dragged me out of the bed. I was trying to run away but he followed, hitting me again in the kitchen. I grabbed the kitchen knife and stabbed him in the lower stomach so I could get away." The officer also testified that appellant had no injuries and complained of no injuries (she "refuse[d EMS] treatment on the scene"), and that he noticed her sleeping cap "was neatly on her head." Another officer who took notes at the scene testified that appellant said her boyfriend "was pushing me and choked me with his hands around my neck. He's 6, 8 [sic] and too big for me to push him off. I had to stab him." This officer, too, testified that appellant was unhurt.

The two homicide detectives who next interviewed appellant also testified at trial, and the video recording of the interview was admitted in evidence. Both

detectives testified that appellant had no injuries (and none are visible in the video recording).

Appellant told the detectives that Harris got on top of her in the bed and repeatedly smacked her in the face. She said he then dragged her off the bed by her legs, at which point she stood up, grabbed a shoe, struck Harris with it, dropped the shoe, and ran into the kitchen. There, appellant explained, she picked up a knife and told Harris (who had followed her) to stop hitting her before he "leaped" at her, at which point she stabbed him. Appellant went on to say that she was not fighting Harris off when she stabbed him, but was reacting to his "leap" toward her. At the end of the interview, she said she only grabbed the knife when Harris entered the kitchen and "looked like he was going to hit me again" because "he went to *lean* in toward[] me." Appellant stated, "I don't remember if he was trying to swing at me or what."

Appellant also told the homicide detectives about her argument with Harris in Capitol Heights on the way home from the wedding reception. She said that after she grabbed Harris's phone and jumped out of his truck, he pushed her to the ground and pulled her hair, and that her dress was "all pulled apart and stuff." She

said she was dragged by the vehicle as Harris pulled off when she opened the door to get back inside.

*Appellant's Testimony at Trial*

Appellant took the witness stand in her own defense at trial. In her brief direct examination, she said she stabbed Harris because she was "scared" and did not elaborate on how it happened. On cross-examination, the prosecutor pressed her to divulge what occurred in greater detail.

In response, appellant provided the following account: Upon returning to her apartment, she went into a separate bedroom because she was upset with Harris. She remained there by herself, lying in bed, for approximately ten minutes. During this period, she testified, she was calm and not upset. Then she got up and went into the bedroom where, she said, Harris was watching television. After taking off her clothes and lying down next to him, appellant started "tapping" Harris and trying to engage him in conversation. He told her to stop. Appellant said she stopped tapping but continued talking. Harris, whose back was turned to appellant, "swung his arm over back toward" her. Appellant understood that he wanted her to leave him alone, but she persisted in talking to him. Harris then suddenly climbed on top of her ("He put his full body on top of me," she testified),

pinned her hands up, and began "[s]macking [her] in [her] face . . . with force," leaving her face "swollen and red." He smacked her in the face approximately six times before he stood up and dragged her off the bed. At that point, though Harris was no longer hitting her or "touching [her] at all," appellant picked up a "heeled boot" and struck Harris with it. She said it was not her boot and she did not know how it happened to be in the room or where on Harris's body she hit him with it.

Appellant testified that she then ran into the kitchen. She claimed that despite her fear, she did not run out of the apartment because she "thought [Harris] would stay in the [bed]room and leave [her] alone," but he followed her to the kitchen. Although the front door to the apartment was only a few steps ahead of her, she still did not leave the apartment. Instead, she grabbed a knife. She then turned to face Harris and "asked him to stop hitting [her]."[24]

Appellant testified that Harris was "still coming and swinging" at her "all at once" when she stabbed him. Then, however, after the prosecutor confronted her with her contrary statements to the homicide detectives – she told them she thought

---

[24] On redirect examination, appellant denied intending to stab Harris when she picked up the knife and said the reason she did so was simply to "[s]top him from beating me."

Harris was going to hit her "because he went to lean in toward[] me" but did not "remember if he was trying to swing at me or what" – appellant ultimately agreed that Harris "wasn't doing anything" to her in the kitchen "but leaning in." She also said she "wasn't sure what he was going to do" there. Appellant conceded that Harris never struck her after she hit him with the boot in the bedroom. Nor did appellant claim he said anything threatening to her before she stabbed him.

Appellant denied ambushing Harris as he entered the kitchen, but she conceded that Harris was "way stronger" than she was and "could have easily disarmed [her] if [she] held a knife at him." Yet when the prosecutor suggested "the reason why he was unable to disarm [her] . . . was because [she] stabbed him without any notice," appellant denied it without providing any alternative explanation for how she was able to stab him. Appellant said Harris was not afraid when she threatened him with the knife. She also testified that Harris did not realize at first that he had been stabbed, and that it was only after she stabbed him a second time that he reacted by grabbing a knife himself. Appellant agreed that she stabbed Harris the second time even though he did not swing at her after she stabbed him the first time.

Appellant ran out of the apartment after Harris armed himself with a knife. She testified that she fled because she feared death or serious bodily injury. She professed to have had that same fear before Harris grabbed a knife, but she had not tried to leave the apartment before then.

The prosecutor also cross-examined appellant extensively about her grievances with Harris and about the events in the hours before the stabbing, tripping appellant up and causing her to contradict herself. For instance, appellant repeatedly denied or minimized her conflicts with Harris and her dissatisfaction with their relationship. Despite being confronted with her text messages strongly suggesting otherwise, appellant – who agreed on the witness stand that she wanted Harris all to herself – claimed she did not mind his having sex with other women. She explained her text about wanting to see a doctor to help her address her "poor behavior" resulting from jealousy and not getting her way as just a lie she told Harris to mollify him. Appellant denied being upset with Harris when he went to Miami.

Appellant similarly denied being fed up with Harris and his treatment of her on the night they attended the wedding reception. Contradicting other witnesses, appellant denied calling Harris names, smacking him, and "mushing" his face at

the reception. She insisted that she was "having fun" there and had danced a lot with Harris. She retracted much of what she had told the homicide detectives about her fight with Harris after the reception on the trip home.[25]

*Physical and Other Evidence Relating to the Homicide*

Surveillance footage of appellant's flight from her apartment showed her throwing a knife into a trash can before she ran to the security booth. The knife, which had an eight-and-one-half-inch blade, was admitted as an exhibit at trial. The medical examiner testified that Harris's death resulted from "rapid blood loss" caused by the stabbings. One of the stabbings punctured the right side of Harris's abdomen, traveled five to seven inches through his skin, subcutaneous tissue, muscle, and large intestine, and penetrated one-and-one-half inches into his liver.

---

[25] Appellant conceded she was not afraid of Harris in Capitol Heights. She explained that what she had described to the detectives as being "pushed [] to the ground" by Harris was actually just his perhaps unintentional "bump[ing] into [her]." While she told the detectives that Harris pulled her hair, she explained at trial that he was merely trying to "untangle his phone" to recover it from her after she snatched it when she exited the truck. Appellant also testified that she was not dragged by Harris's truck, but merely slipped off the curb and fell on her bottom when the vehicle started moving as she tried to get into it. Finally, she testified that the dress she wore that night was not "all pulled apart and stuff," as she told the detectives; rather, she said, some of the hems merely were out. (The dress was introduced in evidence. The crime scene technician testified that it was undamaged.)

The track of the other stab wound went through Harris's right forearm and into his right bicep above the elbow, cutting through his skin, subcutaneous tissue, and muscle, and severing his brachial artery. Harris also had two abraded contusions on his right arm, a cut on the back of his left finger that was consistent with a defensive wound, and a laceration above his left eye. In the medical examiner's opinion, the laceration most likely was the result of being struck in the forehead with a blunt object.

Although appellant testified that Harris forcefully and repeatedly smacked her in the face, leaving it "swollen and red," the government presented evidence that she had no injuries. As previously mentioned, neither the security guard nor the police observed any injuries. After she was arrested, appellant complained of a bruise on her arm and lower back pain, but a crime scene technician who photographed her observed no bruising. Appellant nonetheless was taken to Howard University Hospital, where she continued to complain of back pain, but the attending physician who examined her testified that he observed no tenderness or injuries.

Other relevant physical evidence included the medical examiner's testimony that she measured Harris's blood alcohol content at 0.08 grams per hundred

milliliters and the crime scene technician's testimony in the government's rebuttal case that the television was off when the police entered the apartment. These facts, the government argued, lent additional support to the prosecution's theory that Harris was not watching television when appellant entered the bedroom to talk to him (as she claimed, apparently for the first time, during her cross-examination) but rather was asleep when she attacked him with the boot.[26]

*Appellant's Motion for Judgment of Acquittal*

Appellant's trial encompassed six days of testimony. After the government's rebuttal case, the court took appellant's renewed motion for judgment of acquittal under advisement. The jury deliberated for four days before finding appellant guilty of murder in the second degree while armed. The trial court then denied appellant's motion, explaining that "the reality of this case is this was a credibility determination made by the jury in determining whether the

---

[26] A tussle in the bed could have ensued; the crime scene technician observed that the mattress "had been moved over" and was not directly on top of the bed's box spring. Appellant contended that this observation corroborated her testimony that Harris dragged her out of the bed. On the other hand, the government suggested, the observation that appellant's sleeping cap sat neatly on her head when she was at the security booth in the immediate aftermath of the stabbing cast doubt on her claim that Harris manhandled her.

Defendant's explanation about the events . . . would be credited by the jury, and [it] was not. And the Court cannot find that that determination, at this point, was unreasonable."

### III. Analysis

For several reasons, we conclude that the evidence at trial was sufficient to disprove appellant's claim that she stabbed Harris in self-defense, even though appellant provided the sole eyewitness account of the stabbing and said she acted in self-defense.

As a starting point, the evidence permitted the jury to reject appellant's self-defense claim even if it fully credited her account. That is, even if the jury believed (1) Harris was the initial aggressor, (2) he pinned her down on the bed, smacked her six times, dragged her to the floor, and came at her swinging in the kitchen, and (3) appellant stabbed him to protect herself because she was afraid for her life, the jury nonetheless could find beyond a reasonable doubt that she did not have an objectively reasonable fear of imminent death or serious physical injury and that her use of lethal force was excessive. Those conclusions were supported by the evidence that Harris had not been physically abusive to appellant in their relationship, had never seriously injured her in the past, and did not seriously injure

her or verbally threaten to do so before she stabbed him; that he was unarmed; and that, by appellant's own description, Harris merely leaned toward her in the kitchen and she was not fighting him off when she stabbed him.[27] Furthermore, even if the jury thought appellant's professed fear of Harris reasonable, it still had sufficient evidentiary grounds to find that her decision to use deadly force was unreasonable. After she stabbed Harris, appellant did what the jury could have concluded was available to her *before* she stabbed him – she fled the apartment. Given that option, the jury fairly could find it was objectively unreasonable for appellant to believe it necessary to stab Harris in order to protect herself.[28]

---

[27] *See, e.g.*, *Dorsey v. United States*, 935 A.2d 288, 291-92 (D.C. 2007) (when opponent was unarmed and had uttered no threats, as a matter of law the "situation . . . was not dire enough to justify" lethal force); *Edwards v. United States*, 721 A.2d 938, 941-42 (D.C. 1998) (gunshots at a visibly unarmed opponent constituted excessive force such that jury could not reasonably have found a threat of imminent death or serious bodily harm); *Fersner v. United States*, 482 A.2d 387, 393 (D.C. 1984) (appellant's response of a hatchet blow to a threatened unarmed beating was excessive force as a matter of law).

[28] In cases involving the use of deadly force in self-defense, this jurisdiction has adopted a rule that "permits the jury to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm. In short, this rule permits the jury to determine if the defendant acted too hastily, was too quick to pull the trigger." *Gillis v. United States*, 400 A.2d 311, 313 (D.C. 1979) (holding that the law of the District of Columbia "does not impose a duty to retreat but does allow a failure to retreat, together with all the other circumstances, to be considered by the jury in determining if there was a case of true self-defense"). We specifically have held that this rule applies where, as in the present case, the

*(continued…)*

The foregoing evidence, being sufficient to prove it was not objectively reasonable for appellant to believe she was in imminent peril of death or serious bodily harm and that she needed to use lethal force to save herself, *ipso facto* also constituted some evidence that she did not actually believe either of those things. Indeed, although appellant testified that she told Harris to "stop hitting" her and that she stabbed him because she was "scared," she never explicitly told the jury that she stabbed Harris because she honestly thought at that time that he was about to kill her or seriously injure her. This omission, combined with appellant's testimony that she "wasn't sure what he was going to do," was further evidence that, even accepting the facts as she described them, she did not truly believe herself in immediate danger of death or serious bodily harm.[29]

---

*(continued…)*
defendant claims to have been attacked in his or her home by a co-occupant. *See Cooper v. United States*, 512 A.2d 1002, 1006 (D.C. 1986).

[29] Their relationship history and behavior at the wedding reception and on the way home also supported a conclusion by the jury that appellant did not believe Harris would kill or seriously injure her. The jury could find that, knowing Harris as well as she did, appellant would have known he was not an aggressive or violent man. In the face of her threatening text messages, he never responded in kind. When she would get angry, he remained calm. According to multiple witnesses, this was true even on the night of the homicide. She was unafraid to slap him in front of other people at the wedding reception; and when she did so, he just walked away, and he left the reception in good spirits. The Capitol Heights officers who observed the couple shortly afterward, in the midst of their argument, found Harris to be "cool, calm and collected," in stark contrast to appellant, who was "loud" and "agitated."

Moreover, the additional evidence presented at trial permitted the jury to disbelieve appellant's account and instead find beyond a reasonable doubt that she herself was the first aggressor (when she struck Harris with a boot hard enough to split open his forehead) and that she then caught Harris by surprise when he followed her to the kitchen and stabbed him not in self-defense but out of pent-up rage over his disdainful treatment of her. The evidence supporting this conclusion falls into three categories: motive evidence, direct evidence that appellant did not kill Harris in self-defense, and false exculpatory statements by appellant evincing consciousness of guilt.

Motive evidence does a lot of work in this case because "a self-defense claim raises the issue of whether the defendant was acting out of an actual and reasonable fear of imminent bodily harm, or whether, instead, the defendant had some other motive and was, in fact, the aggressor."[30] In domestic violence homicide cases, "[e]vidence concerning appellant's prior relationship with the decedent and the state of that relationship prior to and at the time of the murder is therefore indicative of the motive appellant may have possessed for committing the

---

[30] *Garibay v. United States*, 634 A.2d 946, 948 (D.C. 1993) (emphasizing the significance of motive evidence, specifically relating to prior relationship history, in cases involving domestic violence).

act."[31]    In this case, the government presented abundant evidence of an acrimonious relationship in which appellant had serious unresolved grievances against Harris that came to a boil in the hours just before their final conflict.  At the wedding reception, Harris disrespected appellant – she wanted his attention, but he walked away from her, laughed at her, ignored her, and danced with others instead of her, all of which made her angry enough to slap him in front of his friends.  They argued further on the way home, and she was upset and angry when they got there.  By appellant's own account, Harris then ignored her at home when she wanted to talk.  This, the jury could find, was the final straw.  Just twelve days earlier, appellant had threatened Harris ("I'm gonna fuck you up if you don't stop playing with me"), and the testimony about their behavior at the wedding confirmed her volatile emotional state on the evening in question.  The jury reasonably could conclude that appellant's overpowering rage at Harris was more indicative of her motive for stabbing him than fear for her physical safety – particularly in view of the evidence, to which we now turn, that contradicted and undermined appellant's claims that Harris attacked her in the bedroom and threatened her in the kitchen.

---

[31] *Clark v. United States*, 412 A.2d 21, 28 (D.C. 1980).

As for his conduct in the bedroom, while appellant testified that he smacked her face, leaving it "swollen and red," and then dragged her off the bed, multiple witnesses testified that she had no injuries. This evidence, seemingly incompatible with appellant's account, permitted the jury to disbelieve her and conclude that Harris did not assault her. That conclusion was reinforced by the crime scene technician's testimony that the television in the bedroom was off when the police arrived, which contradicted appellant's story that Harris was awake and watching television when she came in to the bedroom. The foregoing evidence, along with the decedent's elevated blood alcohol level, the lateness of the hour, and appellant's testimony that she stayed outside the bedroom for some time before going in and confronting Harris, supported the prosecution's theory that Harris did not assault her and was asleep (or barely roused and still unresponsive) when, out of frustration, she attacked him with the boot.

The jury also could find other discrepancies in appellant's account to be supportive of the government's theory. At six feet, eight inches tall, Harris towered over appellant and was, by her own admission, capable of easily disarming her. Yet, she claimed, after he threw her to the floor, she was able to

grab a boot that just happened to be at hand,[32] stand up, and, without meeting any resistance from Harris, strike him forcefully enough with it to split open the very tall man's forehead. The jury reasonably could deem this story implausible and find it more likely that appellant was the first aggressor – that she probably brought the boot into the bedroom with the intention of using it as a weapon and, in any event, that she most likely struck Harris with it while he was lying in bed in a vulnerable state.

The jury reasonably could disbelieve appellant's account of the stabbing as well and conclude that she was not defending herself from Harris. Critical to her self-defense claim was her testimony that she brandished her knife at Harris and warned him to leave her alone before she felt she had to stab him in self-defense. But as appellant conceded, Harris was "way stronger" than she was, and he "easily" could have disarmed her if she held a knife on him. The jury reasonably could have found it unbelievable that appellant managed to inflict two very deep stab wounds, one in Harris's stomach and the other in his arm, if he was forewarned of the danger in the manner she described. Instead, the jury could have

---

[32] When she was questioned about it on the witness stand, appellant professed not to know where the boot's mate was located at the time, and the prosecutor suggested it was unlikely this style of boot was just "lying around" on the bedroom floor in the middle of the summer.

inferred that appellant was able to drive her knife several inches into Harris's abdomen only because she took him by surprise – a conclusion further supported by appellant's statement that Harris did not realize he was stabbed the first time. The jury similarly could have inferred that the stab wound driving completely through Harris's right forearm and continuing into his upper arm was a defensive wound, sustained while he was holding his arm up to protect himself and trying to block the knife with his left hand (which also appeared to have received a defensive wound).

Finally, the jury could find that appellant made numerous false and exaggerated exculpatory statements implying consciousness of guilt. For example, immediately after the stabbing, appellant told police that Harris came into her room and started hitting her in the face and neck; that he put his hands around her neck and choked her; and that he hit her again in the kitchen before she stabbed him to escape. She initially told the homicide detectives that Harris "leaped" at her in the kitchen. These statements all were contrary to appellant's trial testimony, in which she said nothing at all about being choked and ultimately conceded that "at the

kitchen [Harris] wasn't doing anything to [her] but leaning in."[33]  The jury could find that these and other pretrial statements by appellant were knowingly and intentionally false and hence indicative of consciousness of guilt.

The jury could reach the same conclusion with respect to much of appellant's trial testimony.  Her attempt to minimize her grievances over Harris's behavior in their relationship was difficult to credit.  Witnesses contradicted her testimony that she was not in conflict with Harris at the wedding reception.  The crime scene technician undercut her testimony that Harris was awake and watching television (rather than asleep) when she went into the bedroom to talk to him.  Appellant's claim that Harris attacked her after she got into bed with him and smacked her face until it was swollen and red was belied by the testimony of multiple witnesses that she was not injured at all.  If this claim was a fabrication, so, too, must have been the scenario, improbable on its face, that she answered the attack by seizing a handy boot and hitting Harris with it as he stood over her.  Lastly, appellant's testimony that she displayed the knife and warned Harris not to hit her again before she stabbed him in self-defense was undermined by her

---

[33] Similarly, under cross-examination at trial, appellant retracted her earlier claims of physical mistreatment by Harris on the way home from the wedding reception.

admissions that Harris was not actually attacking her when she stabbed him, that he easily could have disarmed her and protected himself, that he was not afraid of her, and that at first he did not even realize she stabbed him. The jury could find it far more plausible that she gave Harris no warning at all and took him by surprise when he was not threatening her (and when she could, instead, have avoided the confrontation altogether by leaving the apartment if she truly felt her life was in danger).

There is a big difference between believing the content of a witness's testimony to be untrue and believing the witness to be lying to exonerate herself. When the latter determination is reasonable, it permits a powerful consciousness-of-guilt inference. This inference, considered along with the crime-scene evidence and the evidence of appellant's motive arising from her unsatisfactory relationship with Harris, provided sufficient evidence for a jury to disbelieve beyond a reasonable doubt that appellant acted in self-defense.

## IV. Conclusion

Viewing the evidence in the light most favorable to sustaining the jury's verdict, we hold it sufficient to permit a rational trier of fact to find each of the elements of murder in the second degree while armed beyond a reasonable doubt.

For the reasons we have adduced, we specifically hold that the evidence in its totality sufficed to disprove appellant's claim that she stabbed Harris in self-defense.  We affirm her conviction.

*So Ordered.*