*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1425

SEQUARN TIBBS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-18757-10)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Submitted November 4, 2014                    Decided January 15, 2015)

*Nancy E. Allen* for appellant.

*Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman* and *Deborah Sines*, Assistant United States Attorneys, and *Susan M. Simpson*, Special Assistant United States Attorney, were on the brief for appellee.

Before THOMPSON, *Associate Judge*, and NEWMAN and FERREN, *Senior Judges*.

THOMPSON, *Associate Judge*:    On May 6, 2013, along with two co-defendants, appellant Sequarn Tibbs pled guilty to assault with a dangerous weapon ("ADW"), conspiracy to commit ADW, two counts of voluntary

manslaughter, and carrying a pistol without a license.[1]  Several months later, at the commencement of appellant's (twice re-scheduled) sentencing hearing, appellant's counsel sought a week's continuance in order to determine whether to file a written motion to withdraw appellant's plea.  After the court denied the request for a continuance, appellant's counsel orally moved to withdraw the plea, arguing that appellant had acted in self-defense and had so claimed throughout his statements to the court during the Rule 11 plea colloquy.  Counsel asserted that there was "no factual basis for [the] plea."  The court denied the motion to withdraw and thereafter sentenced appellant to twenty-five years in prison.

This timely appeal followed.  Appellant now argues that the trial court abused its discretion by summarily denying his motion to withdraw his plea without making any findings of fact and without providing an explanation for the decision.  Appellant asks that we vacate his convictions and remand the case to the trial court to give him an opportunity to withdraw his plea. We grant more limited relief: we remand for the trial court (1) to conduct such further inquiry and

---

[1]  Appellant, like his co-defendants, was indicted on one count of conspiracy, two counts of first degree murder while armed, eight counts of possession of a firearm during a crime of violence, three counts of assault with intent to kill while armed, three counts of aggravated assault while armed, one count of carrying a pistol without a license, and one count of possession of an unregistered firearm.

proceedings as may be necessary to allow it to determine whether appellant has a cognizable claim of self-defense; (2) to reconsider appellant's motion to withdraw his plea in light of that inquiry; and (3) if the court again denies the motion, to explain the basis for that decision.

## I. Background

### A. The Government's Proffer

Appellant and his two co-defendants entered their guilty pleas on May 6, 2013. During the Super. Ct. Crim. R. 11 colloquy that preceded entry of their pleas, the court instructed the defendants to "listen carefully" to the government's account of what its evidence would have been at trial, because the court would "have some more questions of [the defendants] about what the [g]overnment has said." The prosecutor then proffered that, had the case gone to trial, the government would have proven the following facts beyond a reasonable doubt.

Late on October 12, 2009, co-defendants Antonio Barnes and Earl Jackson went with unindicted co-conspirators Malique Wilkins, Paul Riggins, and Daquan Tibbs to the Clay Terrace neighborhood, where Jackson's mother, Katina Wilkins,

lived.  The group, which was associated with the 37th Place, S.E., neighborhood, suspected that Ms. Wilkins's home had been burglarized by Clay Terrace residents. The group, armed with a .45 caliber semi-automatic pistol, a .40 caliber pistol, and a 9 millimeter pistol, intended to retrieve, "with force if necessary," any objects that had been taken from Ms. Wilkins's house.  Once they arrived at the house, they discovered that a .38 caliber revolver was missing, leading some members of the group to verbally confront nearby Clay Terrace residents and demand return of the revolver.  The 37th Place group also demanded a payment of money, although no money had been taken.

Appellant Tibbs joined the 37th Place group at Ms. Wilkins's home early on October 13, 2009, the group having spent the night there while waiting for the gun's return.  Appellant Tibbs was Daquan Tibbs' twin brother, and the group solicited his presence at the Clay Terrace home "so that there would be more members of the 37th Place . . . group on hand."

At some point during the morning of October 13th, an older Clay Terrace resident returned the .38 caliber revolver.  The 37th Place group then remained at Ms. Wilkins's home until almost 4 PM, leaving through the back door upon noticing that Ms. Wilkins had returned home.  The prosecutor proffered that

"[i]nstead of leaving the neighborhood, Malique Wilkins and [appellant] Tibbs went into a courtyard," where a number of Clay Terrace residents were present. The rest of the 37th Place group followed them, and Malique Wilkins and Tibbs each began talking with a Clay Terrace resident. At some point, Malique Wilkins yelled, "They got their guns out," and appellant fired his weapon.[2] A gun battle between the Clay Terrace and 37th Place groups ensued, in which two people died[3] and three were wounded.

## B. Appellant's and Co-Defendants' Statements

After the government's proffer, the court said that it would not ask any of the defendants, "[I]s everything the [g]overnment said correct[?]" Rather, the court asked each defendant about his "participation as far as the shootout is concerned[.]" In their responses, appellant and his co-defendants contradicted a key part of the government's proffer.

---

[2] The government also proffered that appellant admitted during an interview with law enforcement that he was the first to fire his weapon.

[3] Daquan Tibbs, appellant's brother, was killed by a gun fired by his companion, Wilkins. Davonta Artis, a 15-year-old who was not associated with the gun battle, was killed by a gun fired by a Clay Terrace resident.

Co-defendant Barnes, when asked by the court whether he knew something would happen when he walked into the courtyard that day, said, "No," and asserted that prior to entering the courtyard where the shooting subsequently occurred, the 37th Place group had been "headed back to our [own] neighborhood," "going home," when "someone called Malique [Wilkins] to the courtyard." Co-defendant Jackson, who at first told the court he would not be pleading guilty,[4] similarly asserted that someone in the courtyard called out to Wilkins, causing the group to walk inside the courtyard.

When the court asked appellant about his participation and involvement, he affirmed that he arrived at Ms. Jackson's home late in the morning on October 13, 2009, in time to see the .38 caliber revolver returned. Appellant asserted that, at the time the 37th Place group left Ms. Wilkins's house, they "[were] going home." However, as they were "going to the bus stop, one of the Clay Terrace boys called Malique to the courtyard." Appellant followed him "to make sure he was all right[.]" While the two were talking with some of the Clay Terrace residents, someone said, "[T]hey got their guns out," causing appellant to pull out his as well. Next, appellant explained, "[O]ne of them start pointing a gun at me. I start firing." Appellant's counsel added,

---

[4] Jackson has since moved to withdraw his guilty plea as well.

> There was a part . . . when Mr. Tibbs had his gun out and the gentleman from Clay Terrace had their [sic] gun out, [a Clay Terrace resident] was telling both of them to calm down, nothing was going to happen. At that point, the Clay Terrace guy raised his gun towards Mr. Tibbs. [The Clay Terrace resident] backed away, giving the guy a clear shot. At that point, Mr. Tibbs fired the first shots.

Appellant agreed with his counsel's description of the incident.[5]

### C. The Motion to Withdraw the Guilty Plea

At the commencement of the sentencing hearing on December 12, 2013,[6] appellant's counsel opened by requesting a continuance so that he could have more time to determine whether appellant should file a motion to withdraw his guilty plea. Co-defendant Jackson had just filed his own motion to withdraw his plea, and the prosecutor accused defense counsel of engaging in a "stalling tactic" so that appellant could wait to file until he knew the outcome of Jackson's motion hearing. Although defense counsel denied this accusation, the court rejected his

---

[5] We note that appellant gave a similar account to the pre-sentence report writer.

[6] The sentencing hearing previously had been continued two times. The sentencing hearing was first continued from August 16, 2013, to November 7, 2013, in order to provide time for a Youth Act study to be performed. There was a second continuance because defense counsel had car trouble on November 7.

request for a continuance. Counsel then orally moved, twice, to withdraw appellant's guilty plea and asked for a hearing on the motion, contending that there was no factual basis for the plea since appellant's assertions during the Rule 11 hearing described an act of self-defense. The court heard argument from both counsel and then summarily denied the motion to withdraw, ruling first that the motion was "insufficient" and then, after hearing additional argument from counsel, that there was "still an insufficient basis" for the motion.

## II. Analysis

A defendant seeking to withdraw his or her guilty plea under Super. Ct. Crim. R. 32 (e)[7] may do so in one of two ways. The defendant may either "show[] that there was a fatal defect in the Rule 11 proceeding at which the guilty plea was

---

[7] Super. Ct. Crim. R. 32 (e) provides:

> *Withdrawal of plea of guilty.* A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice, the Court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea.

entered[,]"[8] *Gooding v. United States*, 529 A.2d 301, 305 (D.C. 1987) (citation omitted), or that "justice demands withdrawal in the circumstances of the individual case." *Id.* at 305-06. "[A] motion to withdraw a guilty plea made before sentencing . . . should be given favorable consideration if for any reason the granting of the privilege seems fair and just." *Springs v. United States*, 614 A.2d 1, 4 (D.C. 1992) (internal quotation marks omitted). Factors which the trial judge must consider when evaluating a motion to withdraw a guilty plea under the fair and just standard include (1) "whether the defendant has asserted his or her legal innocence"; (2) "the length of the delay between entry of the guilty plea and the desire to withdraw it"; and (3) "whether the accused has had the full benefit of competent counsel at all relevant times." *Gooding*, 529 A.2d at 306-07. "Prior to sentencing, leave to withdraw guilty pleas under the fair and just standard should be freely allowed." *Id.* at 311. "Nevertheless, we will reverse the denial of a motion to withdraw only upon a showing of abuse of discretion by the trial court." *Pierce v. United States*, 705 A.2d 1086, 1092 (D.C. 1997); *see also Byrd v. United States*, 801 A.2d 28, 32 (D.C. 2002) (citing authority that where no Rule 11 error occurred, appellate court will be "extremely reluctant" to find abuse of discretion

---

[8] Relevant here, Rule 11 (f) requires the trial court to make "such inquiry as shall satisfy it that there is a factual basis for the plea." Super. Ct. Crim. R. 11 (f). "The factual basis of which the Rule speaks is . . . sufficient evidence from which a reasonable jury could conclude that the defendant committed the crime." *Pringle v. United States*, 825 A.2d 924, 925 (D.C. 2003).

in trial court's denial of motion to withdraw guilty plea, and that appellant must meet "extremely heavy burden" to prevail).

As described above, in arguing that appellant should be permitted to withdraw his guilty plea, counsel asserted that there was a defect in the Rule 11 proceeding, i.e., that there was no factual basis for appellant's plea since, in his statements to the court, appellant described an act of self-defense. Even if the court was unpersuaded that there had been a defect in the plea proceeding, the court nonetheless was required to "consider the fair and just factors in order to determine whether that alternative standard demand[ed] that the withdrawal motion be granted." *Gooding*, 529 A.2d at 306. The trial court explicitly addressed two of the factors. First, it repeatedly questioned appellant about whether he was satisfied with his counsel, until the court itself was satisfied that appellant was not asserting that he had been without the benefit of competent counsel. Second, the court also made several comments about the timing of the oral motion, and thus — despite the court's summary denial of the motion to withdraw — we can discern from the record the court's assessment that the length of time between the entry of appellant's guilty plea and the communication to the court of his (possible) desire to withdraw the plea weighed against granting appellant's motion. However, even though the prosecutor argued at length that appellant had no cognizable claim of

self-defense, the court never addressed whether appellant had made a valid assertion of "legal innocence." *Gooding*, 529 A.2d at 306. "[A]n assertion [of legal innocence] standing alone does not, of course, require that [a motion to withdraw a guilty plea] be granted[,]" *id.* at 306, but "a claim of innocence is an important . . . factor to be weighed by the trial judge in deciding whether, in the exercise of discretion, a motion to withdraw a guilty plea, under the fair and just standard should be granted." *Springs*, 614 A.2d at 5 (noting, however, that the trial judge "should not attempt to decide the merits of any defense put forward[]"). For that reason, a court does not appropriately exercise its discretion if it does not consider whether a defendant has made a valid claim of legal innocence.

We cannot say that the court's omission of that consideration in this case was harmless. The government argues that appellant "had no legitimate claim to the defense of self-defense, since he . . . voluntarily placed himself in a position which he could reasonably expect would result in violence." *Howard v. United States*, 656 A.2d 1106, 1111 (D.C. 1995) (quoting *Nowlin v. United States*, 382 A.2d 9, 14 n.7 (D.C. 1978)); *see also Mitchell v. United States*, 399 A.2d 866, 869 (D.C. 1979) (finding no cognizable claim of self-defense where a defendant "placed himself in a position reasonably calculated to provoke trouble"). However, our case law invoking this rule has applied it to situations in which

defendants had a violent or threatening encounter with specific individuals and then shortly thereafter sought out those same individuals again. *See, e.g.*, *Sams v. United States*, 721 A.2d 945, 949-50, 953 (D.C. 1998) (holding defendant could not assert self-defense when he claimed to have returned to engage "amicably" with a man who had just threatened him with a knife); *Howard*, 656 A.2d at 1109, 1111 (holding that where, after a confrontation, the defendants left, "armed themselves with a considerable amount of firepower," and drove to the adversary's house, "even if [someone there] made the first move for a gun once [the defendants] had arrived, armed, . . . the degree of initiative [defendants] had taken in creating the confrontation precluded a claim of self-defense"); *Brown v. United States*, 619 A.2d 1180, 1182 (D.C. 1992) (holding that a defendant cannot successfully claim self-defense when "he left an apparently safe haven to arm himself and return to the scene[]" (internal quotation marks omitted)); *Mitchell*, 399 A.2d at 869 (holding defendant could not assert self-defense after first verbally fighting with the victim and then following the victim outside onto a public street). Here, even taking into account that appellant was charged with conspiracy to commit ADW and thus could be held vicariously liable for the conduct of the other members of the 37th Place group, we think it at least arguable that the co-defendants' conduct on October 12-13 was quite different from the conduct described in the foregoing cases. On October 12, the 37th Place group asked some

Clay Terrace residents to return the revolver, and there was no indication in the government's proffer that this interaction was violent or threatening. In addition, the record, insofar as it was developed at the plea proceeding and sentencing hearing, does not disclose which Clay Terrace residents were involved in this first encounter or whether they were also involved in the October 13 incident at the courtyard. Further, according to the government's proffer and the statements of the defendants during the Rule 11 proceeding, the revolver was returned during the late morning of October 13th, suggesting that the cause for the tension had dissipated. Also according to appellant's and Barnes's statements at the Rule 11 proceeding, the 37th Place group left Ms. Jackson's unit and went outside — not to seek out trouble or even to meet with Clay Terrace residents — but to head back to their own neighborhood. Like his co-defendants, appellant was insistent at the Rule 11 proceeding that the 37th Place group entered the courtyard only because a Clay Terrace resident beckoned one of their group. If true, these facts arguably signified an end to any conspiracy that may have existed to assault Clay Terrace residents. Additionally, appellant asserted that he pulled out the gun he was carrying because the Clay Terrace residents had pulled out theirs and that he fired his gun because a Clay Terrace resident had raised his weapon as if to shoot.

In short, in his statements during the Rule 11 proceeding, appellant gave an account that, at least without further inquiry, was not consistent with the offense of voluntary manslaughter to which he pled guilty.[9]  We have cautioned "the trial court[] that when faced with a presentencing request for withdrawal of a guilty plea, full inquiry should be made beyond the confines of the Rule 11 hearing." *Gooding*, 529 A.2d at 306 (internal quotation marks omitted).  The court here did not make a full inquiry to ferret out additional details during the plea proceeding to determine whether appellant could avail himself of a self-defense claim.  Nor did the court do so after appellant's counsel had moved to withdraw appellant's plea and had explained the inconsistencies between appellant's plea and his account of what led up to the shooting.  In addition, the court denied the motion with a cursory "insufficient" ruling that did not reveal what consideration, if any, the court gave to the self-defense claim.

---

[9]  *See Blaize v. United States*, 21 A.3d 78, 82 n.5 (D.C. 2011) (noting that for the jury to be able to find appellant guilty of voluntary manslaughter, the government had to establish, *inter alia*, "that appellant . . . did not act in self-defense").

Presented with this record, we are unable to affirm the denial of appellant's motion to withdraw his plea.[10] We therefore remand for the trial court to consider whether appellant has a valid claim of self-defense, to reconsider whether appellant should be permitted to withdraw his plea, and, if the court again declines to permit withdrawal of the plea, to explain the basis for its ruling. *Cf. Johnson v. United States*, 597 A.2d 917, 919-20 (D.C. 1991) (remanding case for further consideration by the trial court where defendant had sought to withdraw plea on the morning of sentencing, 16 months after entering the plea, and where the court gave short shrift to a claim of self-defense).

*So ordered.*

---

[10] This is so even considering the government's contention that appellant's desire to withdraw his plea was motivated by his learning that his co-defendant Barnes had been sentenced to twenty-five years in prison and that co-defendant Jackson had filed a motion to withdraw his plea. We note, however, that appellant's counsel represented to the court that appellant had asked his counsel about withdrawing his plea in mid-August 2013, several weeks before Barnes was sentenced and several months before co-defendant Jackson made his own motion to withdraw.