# District of Columbia
# Court of Appeals

**Nos. 14-CF-268 & 14-CF-300**

DEONTE J. BRYANT & TERRANCE M. BUSH,

Appellants,

v.

UNITED STATES,

Appellee.

NOV - 3 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

CF1-12641-11 &
CF1-13086-11

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge;* BLACKBURNE-RIGSBY, *Associate Judge*; and BELSON, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's judgment is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: November 3, 2016.

Opinion by Chief Judge Eric T. Washington.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

FILED 11/3/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Nos. 14-CF-268 & 14-CF-300

DEONTE J. BRYANT & TERRANCE M. BUSH, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF1-12641-11 & CF1-13086-11)

(Hon. John Ramsey Johnson, Trial Judge)

(Argued February 18, 2016                    Decided November 3, 2016)

*Rachel W. Apter*, *pro hac vice*, by special leave of court, with whom *Carrie Lebigre*, *pro hac vice*, by special leave of court, and *Mark S. Davies* were on the brief, for appellant Deonte J. Bryant.

*Jessie K. Liu*, with whom *Jack Douglas Wilson* was on the brief, for appellant Terrance M. Bush.

*John Cummings*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Jennifer Kerkhoff*, and *Kathryn Rakoczy*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, BLACKBURNE-RIGSBY, *Associate Judge*, and BELSON, *Senior Judge*.

WASHINGTON, *Chief Judge*: Deonte J. Bryant ("Bryant") and Terrance M. Bush ("Bush") (collectively "appellants") challenge their convictions, arising from a shooting on June 25, 2011, during the Caribbean Festival on Georgia Avenue, N.W. in Washington D.C.[1] The shooting resulted in the injury of Alexcia Harrison and Trevis Johnson and the death of Robert Foster, Jr.

On appeal, appellants assert that the trial court abused its discretion by admitting both the government's video compilation of the shooting and certain gang affiliation evidence intended to show that appellants possessed a gang-related motive for carrying out the shooting. Appellants also argue that the trial court erred by instructing the jury using the government's "urban-gun-battle theory" to prove the intent element of first-degree murder and instructing the jury that provocation by presence in rival gang's neighborhood negated appellants' ability to claim self-defense. Lastly, appellants challenge the sufficiency of the evidence to support their convictions for first-degree premeditated murder. Separately, Bush contends

---

[1] Appellants were convicted of: first-degree murder while armed ("MIWA"), D.C. Code § 22-2101 (2012 Repl.); assault with intent to kill while armed ("AWIKWA"), D.C. Code § 22-401 (2012 Repl.); aggravated assault while armed ("AAWA"), D.C. Code § 22-404.01 (2012 Repl.); possession of a firearm during a crime of violence ("PFCV"), D.C. Code § 22-4504 (b) (2012 Repl.); carrying a pistol ("CP"), D.C. Code § 22-4504 (a) (2012 Repl.). Additionally, Bush was convicted of unlawful possession of a firearm ("UPF"), D.C. Code § 22-4503 (a)(2) (2012 Repl.). Judge Johnson sentenced Bryant to 726 months in prison and Bush to 738 months in prison.

that the trial court abused its discretion in denying his motion to sever his trial from that of Bryant.   We affirm the trial court's judgment as to each defendant.

## I.

According to the government's evidence at trial, the incident occurred on June 25, 2011, at the annual Caribbean Festival on Georgia Avenue, N.W. in Washington, D.C., where Bush, a member of the LeDroit Park ("LDP") or West Side gang, Bryant, a member of the Clifton Terrace University ("CTU") gang, and an unidentified friend engaged in a "gun battle" incited by gang-related tensions with Terry Jimenez ("Jimenez"), a member of the 11th Street/Hobart ("Hobart") gang and two of his friends ("Young" and "Butler"). In the course of the shoot-out, three innocent bystanders were shot; one of whom was killed.   Bush, Bryant, and Jimenez were each charged and indicted for the killing of Robert Foster, Jr. and other charges arising from the shooting.   Before trial, and as part of a cooperation agreement with the government, Mr. Jimenez pled guilty to second-degree murder, AAWA, and Assault with a Dangerous Weapon ("ADW") and agreed to testify against Bush and Bryant.

At trial, the jury heard the testimony of Jimenez, his two friends, Young and

Butler, the testimony of the two surviving victims, Trevis Johnson and Alexcia Harrison, and various Metropolitan Police Department ("MPD") officers familiar with the neighborhood. The government also presented evidence of appellants' gang affiliation to provide "context" for Jimenez's and Bryant's motive for engaging in the shooting. Neither Bush nor Bryant testified.

On the date of the incident, Jimenez traveled to meet his friends and attend the Caribbean Festival on Georgia Avenue. Young testified that he and Jimenez went to the liquor store and then sat down on a porch near Georgia Avenue and Harvard Street to drink and to smoke three or four K2 joints. Jimenez denied smoking. Jimenez's friend Butler joined him and Young. Young stated that he saw Bryant "mean-mugging" Jimenez from across the street. After this exchange, Young testified that Jimenez ran to get a gun, after which Young left to get his little brother from the neighboring Bruce Monroe playground, fearing that an altercation was about to ensue. Jimenez testified, however, that he had already retrieved a gun for protection prior to seeing Bryant because he had seen several CTU members in the Hobart neighborhood earlier in the day. On his walk from the playground, Young ran into Bryant, who told him to "tell your man we trying to work." On cross-examination, Young stated that he considered these words to be threatening, but never mentioned them to Jimenez. Butler, Jimenez's other friend, testified that

he also spoke to Bryant, but did not recall what was said. Young and Butler then met up with Jimenez on Harvard Street and proceeded to follow Bryant, Bush, and another companion. Young testified that Jimenez was "going nuts" and Butler described Jimenez's demeanor as "disturbed." As Bryant's group began to turn the corner of Georgia Avenue onto Gresham Place, Young and Jimenez witnessed Bryant place his hand on his waistband, or "pump fake."

Video surveillance footage of the incident depicted Bush, Bryant, and a friend turning the corner and walking down the left side of Gresham Place. The government argued that the video depicted both Bush and Bryant, stopping on the corner of Gresham and "pump faking" (placing a hand on one's waistband) to indicate to Jimenez and his friends that they were carrying guns. The video showed that Bryant, Bush, and their friend continued to walk west on the south side of Gresham Place. Jimenez's group followed, but remained on the north side of Gresham, while Bryant kept looking over his shoulder at Jimenez, smiling at him like it was "a game." Butler testified that he tried to "talk [Jimenez] off the ledge saying words to the effect [of], hey, Terry, don't do anything stupid," but Jimenez did not listen and continued to follow. Butler decided to stay with Jimenez, following him towards Gresham, because he "thought he might get into a [fist] fight and [he] didn't want him to fight by hisself [sic]." Butler was beside Jimenez on the

sidewalk on the north side of Gresham Place.   Then, as Jimenez walked into the street near the crosswalk, Butler and Young saw and heard Jimenez fire his weapon and the two ran.   When Jimenez fired, Butler did not see anyone else with a weapon and did not see anyone else fire.   He testified that he only saw Jimenez, facing down Gresham towards Sherman Avenue, pointing a gun.   All other testifying witnesses stated that they saw Jimenez with a gun or actually fire the gun.   Jimenez testified that he saw Bryant pull out a gun as he crossed Gresham.   During the shooting, Jimenez was shot in the elbow, which caused him to retreat north toward Georgia Avenue.   He fired two additional shots as he retreated from the scene.   Bryant, Bush, and the companion retreated as well, running south down Gresham.   In the cross-fire, Alexcia Harrison suffered a gunshot wound to the abdomen; Trevis Johnson, who dove to the ground when he heard gunshots, was hit in his leg and his side; and Robert Foster, Jr., was fatally wounded when a bullet entered the right side of his back.

Twelve 9mm shell casings, a 9mm magazine, and three .45 caliber shell casings were recovered from the scene.   The gun that Jimenez used was a .45 caliber Hi-Point handgun.   A ballistics expert determined that the casings are consistent with being fired from three separate guns. At trial, the jury also heard testimony from several officers involved in the investigation.   Additionally, the

government presented evidence of Bryant's and Bush's gang affiliation to provide a context for the shootout and three surveillance videos that captured, from different angles, the moments leading up to the shooting as well as the shooting itself. These videos were made into a synchronized compilation that was also admitted into evidence and shown to the jury.

On December 13, 2013, the jury found appellants Bryant and Bush guilty of MIWA; AWIKWA; AAWA; CP; and five counts of PFCV. Appellants timely appealed.

## II.

### A. Video Compilation

On appeal, appellants claim that the admission of the video without authentication by the person who created it violated their rights under the Confrontation Clause of the Sixth Amendment because the video was a testimonial statement offered for its truthful depiction of what transpired on the day of the incident.

At trial, the government presented a compilation video containing three individually admitted videos in a synchronized rendition to allow the court and jury to see all three videos simultaneously. The compilation consisted of two videos from the surveillance camera of Joshua Hertzberg, a resident of Gresham Place, and one video from the convenience store located on the corner of Gresham Place and Georgia Avenue. Appellants objected to the admission of the video on the ground that the synchronized video had the potential of confusing the jury. In response to appellants' objection, the trial court admitted the video, and requested that the prosecutor make the creator of the video available for cross-examination about the process used to compile and synchronize the videos. Prior to resting its case, the government contacted trial counsel for both appellants by email to see if they were still interested in having the person who prepared the exhibit called as a witness. Bryant's counsel responded that he was no longer asking for the witness to be presented and counsel for Bush never responded to the e-mail. The witness was never presented by the government at trial and neither counsel for appellants raised a concern at trial. Appellants now argue that the failure of the government to produce this witness requires reversal of appellants' convictions because the admission of the video without the testimony of the creator was a violation of the Confrontation Clause. Because appellants failed to raise the Confrontation Clause objection at trial, we review the admission of the video compilation for plain error. *See Thomas*

*v. United States*, 914 A.2d 1, 8 (D.C. 2006); (*Joyce B.*) *Johnson v. United States*, 520 U.S. 461, 462 (1997) ("The *Olano* [plain error] test . . . requires that there be (1) error, (2) that is plain, and (3) that affects substantial rights. If these three conditions are met, an appellate court may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."). *Olano v. United States*, 507 U.S. 725, 113 (1993).

We are satisfied that the video was properly admitted because it was authenticated by a witness who was present during the shooting and who testified that the video accurately portrayed the events of that day. *See Gray v. United States*, 100 A.3d 129, 138-39 (D.C. 2014); *see also United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014); *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005). However, even assuming appellants can show error that was plain, appellants have failed to show that their rights were substantially affected by the admission of the video. To satisfy the third prong of plain error, appellant must show a reasonable probability that the Confrontation Clause violation had a prejudicial effect on the outcome of his trial. *Thomas*, 914 A.2d at 21. Unlike cases like *Thomas*, where similar non-structural errors were found to have affected appellant's substantial rights, here the admission of a video had no prejudicial effect

on the outcome of appellants' trial. The video compilation was not an essential part of the government's case, nor did it prove an essential element of the charged crime. Regardless of whether the video compilation was testimonial in nature, it was a minute piece of the government's evidence of the shooting, admitted by the trial court only to assist the jury in viewing the three videos simultaneously. *See Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006). Because the compilation was merely comprised of three videos, which had been admitted individually without objection, and the compilation's accuracy was corroborated by Jimenez's testimony, we are satisfied that the trial court's admission of the evidence did not substantially affect appellants' rights, and therefore, did not constitute plain error.

## B. Admissibility of Gang Evidence

Appellants also argue that the admission of evidence pertaining to their involvement or affiliation with neighboring gangs was unfairly prejudicial, and thus, an abuse of the trial court's discretion. The government contends that the gang evidence, which consisted of police and witness testimony, and photographs of appellants' participation or affiliation with "neighborhoods," or gangs, was admissible to "put the defendants' actions in context" as support for its

urban-gun-battle theory of liability or in the alternative, as *Drew* evidence of motive, plan, intent, or identity. Appellants repeatedly objected to the admission of this evidence. In response to appellants' objections, the trial court found that "it is extremely important for the Government to be allowed to show the kind of relationships from which this [shooting] arose" and to enable the government to establish a motive for appellants' actions.

The trial court's decision to admit gang evidence is subject to review for abuse of discretion. *Campos-Alvarez v. United States*, 16 A.3d 954, 959 (D.C. 2011). Evidence is relevant, and therefore admissible, if it has "any tendency to make the existence of any fact . . . of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Lazo v. United States*, 930 A.2d 183, 185 (D.C. 2007). When gang evidence is relevant, the trial court must "balance the probative value of the gang references against their potential for prejudice." *Campos-Alvarez*, 16 A.3d at 960. Evidence of gang affiliation or retaliation is only admissible after it has been determined to be "relevant, necessary and supported by competent evidence." *Plummer v. United States*, 813 A.2d 182, 189 (D.C. 2002). "The admission of evidence whose sole purpose is to connect a defendant to a group of people of questionable character and [that is] not relevant to some other factual issue is improper." *Campos-Alvarez*, 16

A.3d at 961; *see* (*William A.*) *Johnson v. United States*, 683 A.2d 1087, 1092 (D.C. 1996) (en banc).

## 1. Gang Affiliation Evidence

Here, the trial court admitted the gang affiliation evidence of both Bryant and Bush in order to provide context for the events that led to the shooting. The government asserted at trial that the gang affiliation evidence was relevant and highly probative to show why appellants arrived to the festival with guns, why Jimenez armed himself after seeing members of the CTU gang in his neighborhood, why Jimenez perceived the mean-mugging and pump faking as a threat of deadly force, and why appellants opened fire with the intent to engage in a gun battle and not in self-defense.

For the reasons stated by the trial court, we agree that the evidence of Bryant's affiliation with CTU and Jimenez's affiliation to Hobart provided necessary context and history to enable the jury to understand why these two individuals may have engaged in a gang-related shooting. Evidence of hostility between Bryant and Jimenez, and their respective neighborhoods, CTU and Hobart, was properly

admitted as relevant and necessary evidence tending to prove motive or intent to engage in the subsequent shoot-out. Therefore, with respect to the admission of gang affiliation evidence against Bryant, we find no abuse of discretion.

As to the gang evidence admitted against Bush, although slightly more prejudicial than that admitted against Bryant, we conclude that the trial court did not abuse its discretion in admitting the evidence of gang affiliation to show Bush's motive for engaging in the shoot-out. The evidence of Bush's membership in "LDP" or "West Side," was both relevant and necessary to explain why Bush participated alongside Bryant, and to show that Bush, as a member of an allied neighborhood, had similar motive and intent to engage in a shoot-out with Hobart, a rival neighborhood. Unlike the extreme prejudice that can often result from the use of gang evidence to show a propensity of violence or bad character, here the evidence against both Bryant and Bush was supported by competent police testimony and was admitted for a probative purpose to establish appellants' motive and intent for engaging in a shoot-out with Jimenez and to provide context for their actions throughout the altercation. As this court described in *Lazo*, this type of motive evidence provides additional probative information to the jury by "supply[ing] . . . a motive for an otherwise unexplained [assault]." *Lazo*, 930 A.2d at 185. Further, the trial court, acknowledging the potential for prejudice that could

stem from the admission of gang evidence, provided the jury with a limiting instruction and required that the groups be referred to as "neighborhoods" rather than gangs. Thus, we find no abuse of discretion as the evidence's probative value was not substantially outweighed by its prejudice against appellants.

## 2. *Drew* Evidence

At trial and during opening and closing arguments, the government referred to the 2011 murder of Lucki Parnell ("Parnell"), a close friend of Jimenez and the 2007 murder of Johnathon Franklin ("Franklin"), a close friend of Bryant. The government presented testimony from police officers that members of both Hobart and CTU blamed the other neighborhood for these murders. The government used this evidence at closing to argue that these murders, which both Jimenez and Bryant were personally connected to, created an on-going feud between members of CTU and Hobart.

While typically, evidence of other uncharged crimes is inadmissible, *see Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964), "other crimes evidence is admissible, if it is necessary to place the charged crime in an understandable context." (*William A.*) *Johnson*, 683 A.2d at 1098.

In *Johnson*, this court recognized that there are three types of evidence to which *Drew*, under already existing case law, does not apply: (1) direct and substantial proof of the charged crime, (2) [] closely intertwined with the evidence of the charged crime, or (3) [] necessary to place the charged crime in an understandable context. *Brown v. United States*, 934 A.2d 930, 940 (D.C. 2007). To meet the third exception, the government must show that its other crimes evidence was necessary to prove that he committed the crime charged, and ". . . so closely related to the charged offense in time and place that [it is] necessary to complete the story of the crime . . . by placing it in context of nearby and nearly contemporaneous happenings." *Id.* (internal citations and quotations omitted).

Here, the murders of Parnell and Franklin were neither necessary proof of, nor contemporaneous to, the crime charged. This "other crimes" evidence was merely cumulative of other testimony describing the rivalry or feud between Hobart and CTU, and thus, was not necessary to establish Bryant or Bush's gang-related motive for the shoot-out. Moreover, the murder of Franklin took place more than four years before the incident at issue and the murder of Parnell was relevant only to Jimenez's motive to engage in the shoot-out with Bryant and Bush, not to show Bryant's or Bush's motive to harm Jimenez. We conclude, however, that the admission of this evidence was harmless given the trial court's limiting instruction

and because the evidence was not used to show that Bryant or Bush possessed a motive or desire to seek revenge for the murders of his friend/fellow gang-member, but simply that their affiliate neighborhoods had a contentious history and were considered rival groups. Thus, where the evidence was not substantially relied upon, and properly limited by the trial court, we are satisfied that the error did not sway the outcome of appellants' convictions.

### C. Urban-Gun-Battle Theory Instruction

Appellants also argue that the government's urban-gun-battle theory of causation was inapplicable to the elements of first-degree premeditated murder. We disagree.

Whether a jury instruction was properly given is a legal question, which we review *de novo*. *Appleton v. United States*, 983 A.2d 970, 977 (D.C. 2009). At trial, the trial court denied appellants' motion objecting to the urban-gun-battle theory instruction and gave the following instruction:

> The elements of first-degree premeditated murder while armed, each of which the Government must prove beyond a reasonable doubt are that: one, Deonte Bryant and Terrance Bush caused the death of Robert Foster, Jr.; two, Deonte Bryant and Terrance Bush intended to kill another person; three, he did so after premeditation; four, he did so after

deliberation; five, he did not act in self-defense; and six, he committed the offense while armed with a firearm.

A person causes the death of another person if his conduct is a substantial factor in bringing about the death and if it was reasonably foreseeable that death or serious bodily injury could result from such conduct. It is not necessary for the Government to prove that a defendant personally fired the fatal round in this case. Rather, if the Government proves beyond a reasonable doubt that one, Deonte Bryant and Terrance Bush were armed and prepared to engage in a gun battle, two, he did in fact engage in a gun battle in the 700 block of Gresham Place, N.W. on June 25, 2011; three, he did not act in self-defense as I will describe that concept to you at the time he participated in a gun battle; four, Deonte Bryant and Terrance Bush's conduct in the 700 block of Gresham Place, N.W. on June 25, 2011 was a substantial factor in the death of Robert Foster, Jr.; and five, it was reasonably foreseeable that death or serious bodily injury to innocent bystanders could occur as a result of Deonte Bryant's and Terrance Bush's conduct in the 700 block of Gresham Place, N.W. on June 25, 2011, then as a matter of law, Deonte Bryant and Terrance Bush are deemed to have caused the death of Robert Foster, Jr.

Appellants reassert on appeal that the urban-gun-battle theory of liability, typically applied in the context of second-degree murder, was erroneously applied to appellants' charges of first-degree premeditated murder. Appellants contend that because the government never presented evidence of who shot the fatal bullet, neither appellant can be found guilty under an urban-gun-battle theory. Further, appellants contend that the urban-gun-battle theory was only intended to apply to actions of recklessness or depraved heart which cause an increased risk of injury to

innocent bystanders—actions that inherently constitute the *mens rea* for second-degree murder.

In *Roy v. United States*, 871 A.2d 498 (D.C. 2005), this court established, and later reiterated in *McCray v. United States*, 133 A.3d 205, 225 (D.C. 2016), that a defendant may be convicted of murder for participating in an urban gun battle "where he intentionally participates in a shootout among feuding individuals and that shootout is the proximate cause of the bystander's death." The court, in *Roy*, explained that "it is this increased risk to innocent bystanders which justifies the application of proximate cause liability to those participants who willfully choose to engage in these battles." *Roy*, 871 A.2d at 507. We see no reason why the same rationale should not apply in the first-degree murder context where the government can show that appellants engaged in a shoot-out with the premeditated and deliberate intent to kill another in the vicinity of hundreds of innocent bystanders, such as the forum chosen by appellants in this case. While we acknowledge that this court has never upheld the application of the urban-gun-battle theory to a conviction of first-degree murder, and that the theory is perhaps more generally applicable to second-degree murder where a dispute breaks out between individuals and it is unclear whether the shoot-out was the result of premeditation and deliberation or was provoked by something that happened during the specific confrontation, we fail

to see how the instruction is incompatible with first-degree murder if the jury is properly instructed. As long as the government can meet its burden of proving that the defendants caused the death of the decedent, with premeditation and deliberation, while engaged in an urban gun battle, and that the defendants' were not acting in self-defense, the elements of first-degree murder have been satisfied.

To establish the charge of first-degree murder, the government must prove beyond a reasonable doubt that: (1) the defendant caused the death of the decedent; (2) he did so with the specific intent to kill the decedent;[2] (3) after premeditation; (4) he did so after deliberation; (5) there were no mitigating circumstances; and (6) he did not act in self-defense. *Williams v. United States*, 858 A.2d 984, 1001-02 (D.C. 2004).

At trial, the government was required to prove not only causation (via the urban-gun-battle theory), but also the separate *mens rea* requirement for first-degree murder of premeditation and deliberate intent to kill. Despite appellants' reading of

---

[2] Appellants' contention that the government is required to present evidence of who fired the bullet which killed Robert Foster, Jr. in order to satisfy the requirements for first-degree murder is incorrect. *See McCray*, 133 A.3d at 228 ("To prove a specific intent to kill, the government is not required to show that the accused actually wounded the victim.") (citations omitted).

the court's intent in *Roy*, appellants point to no authority which would persuade us that the urban-gun-battle theory is not equally applicable as a theory of causation to this case. Here, a reasonable jury could have found that, both Bryant and Bush possessed the premeditated and deliberate intent to kill Jimenez, and with this intent, engaged in a public gun battle, where a bullet shot during the exchange struck Robert Foster, Jr., causing his death. By engaging in the shoot-out, appellants were a substantial factor in causing the death of another, although they intended only to kill Jimenez. Thus, where evidence was presented to establish all elements of first-degree murder, we conclude that the trial court's application of the urban-gun-battle theory was not erroneous in the context of appellants' first-degree murder charges.[3]

### D. Provocation Instruction

For the first time on appeal, appellants challenge the provocation instruction given at trial.[4] "To satisfy the plain error test, . . . 'the defendant bears the burden of

---

[3] A similar application of the urban-gun-battle theory has been upheld in other jurisdictions as well. *See Commonwealth v. Santiago*, 681 N.E.2d 1205 (Ma. 1997); *see also People v. Sanchez*, 29 P.3d 209 (Ca. 2001).

[4] The jury was instructed: "If you find that a defendant was an aggressor or provoked the [conflict] upon himself, he cannot rely upon the right of self-defense to justify his use of force. One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble, cannot claim

(continued . . .)

demonstrating that there [was] "error," i.e., "deviation from a legal rule"';[sic] that the error was "'plain," i.e., "obvious" or "clear under current law"';[sic] and that the error "'affect[ed his] substantial right. Even then, we will not reverse unless the defendant makes the additional showing of "either a miscarriage of justice, that is, actual innocence; or that the trial court's error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Mozee v. United States*, 963 A.2d 151, 159 (D.C. 2009).

Instruction on provocation is properly given when there is evidence of self-defense and evidence that the defendant provoked the action from which he was defending himself. *Rorie v. United States*, 882 A.2d 763, 775 (D.C. 2005). Where the defendant asserts a defense of self-defense, if "there is sufficient evidence to justify a self-defense instruction, the burden is on the government to disprove self-defense, by meeting its burden of proof negating the defendant's subjective actual belief or objective reasonableness." *Andrews v. United States*, 125 A.3d 316, 322 (D.C. 2015) (citing *id.* at 771). In other words, if there is sufficient evidence presented to justify the giving of a self-defense instruction, it is the government's burden to establish beyond a reasonable doubt that the defendant

_____

(. . . continued)
self-defense. Mere words without more by a defendant however, do not constitute aggression or provocation."

did not act in self-defense. After evidence has been presented to negate a claim of self-defense, the trial court must decide, as a matter of law, whether there is record evidence sufficient to support the claim. *Howard v. United States*, 656 A.2d 1106, 1111 (D.C. 1995). We have repeatedly affirmed the principle that "[s]elf-defense may not be claimed by one who deliberately places himself [or herself] in a position where he [or she] has reason to believe his [or her] presence . . . would provoke trouble." *Id*. "[O]ne who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. Only in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense." *Rorie*, 882 A.2d at 772.

Appellants contend that the government failed to proffer evidence of provocation in accordance with this court's holding in *Tibbs v. United States*, 106 A.3d 1080, 1085 (D.C. 2015), which acknowledged that forfeiture of a claim of self-defense has typically occurred where a defendant has engaged in "a violent or threatening encounter with specific individuals and then shortly thereafter sought out those same individuals again." *Id*. While we agree that prior violent or threatening encounters between the same individuals typify the type of behavior we predominately consider to qualify as provocation, we reject appellants' argument that *Tibbs* has established a new and exhaustive description of all provocative

actions under D.C. law. We read *Tibbs*, not as an explication that all provocation must be violent or aggressive, and instead find that the court meant only to distinguish the relatively cordial exchange between the parties in that case, from the typical scenarios of prior confrontation which often include some act of aggression.

Even conceding the distinction appellant attempts to draw from *Tibbs*, both appellants exhibited threatening and aggressive acts sufficient to establish provocation. Unlike the relatively cordial exchange between members of neighborhood groups in *Tibbs*, there was adequate evidence of persistent threatening conduct, primarily consisting of Bryant's "mean-mugging," threatening statement to Young and "pump faking," which Jimenez interpreted to indicate that Bryant was carrying a gun, to establish provocation and warrant the instruction. As for Bush, the jury could have reasonably inferred that Bush's presence in the Hobart neighborhood with a weapon, as he accompanied Bryant, a CTU member, during multiple acts of explicit provocation against a rival group member, was an act of provocation all on its own. Although Bush was not the primary actor in the incident, the record reflects that he accompanied Bryant at each step of the provocation and acted upon these provocations during the shooting. One "who deliberately places himself in a position where he has reason to believe his presence . . . would provoke trouble" still may not claim self-defense. *Mitchell v. United*

*States*, 399 A.2d 866, 869 (D.C. 1979); *see Andrews v. United States*, 125 A.3d at 323; *Bryant v. United States*, 93 A.3d 210, 228 (D.C. 2014); *Harper v. United States*, 608 A.2d 152, 156 (D.C. 1992). Unlike the dissipation of conflict that seems to have occurred in *Tibbs*, appellants did not retreat after engaging Jimenez and his friends, but continued their menacing conduct, which ultimately elevated and culminated in the final shoot-out. It is true that Jimenez's responsive actions went beyond "pump faking" since eyewitnesses testified that he fired his gun first, inferentially in appellants' direction, before they fired back and caused (or co-caused) the death and injury to bystanders. Nevertheless, reviewing the instructional ruling only for plain error, we conclude that appellants' actions were sufficiently of a kind intended to provoke trouble that the trial judge's decision to submit provocation to the jury is no ground for reversal**.**

### E. Sufficiency of the Evidence for First-Degree Murder

Additionally, appellant Bryant challenges the sufficiency of the evidence, arguing that the government failed to proffer sufficient evidence of premeditation and deliberation to satisfy the elements of first-degree premeditated murder.

In evaluating the sufficiency of evidence and viewing the evidence in the light

most favorable to the government, "we must give full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences." *Ewing v. United States*, 36 A.3d 839, 844 (D.C. 2012). Where we find that there was no evidence from which a reasonable juror could find guilt beyond a reasonable doubt, we must reverse a criminal conviction. *See Moore v. United States*, 927 A.2d 1040, 1049 (D.C. 2007).

First-degree murder is committed with the specific intent to kill after premeditation and deliberation. D.C. Code §§ 22-2101, -4502 (2012 Repl.). Premeditation occurs when the defendant forms the specific intent to kill for a period of time, no matter how short, prior to the murderous act. *Kitt v. United States*, 904 A.2d 348, 354 (D.C. 2006). Deliberation is a separate element from premeditation and requires that the defendant have reflected over his existing purpose and design to kill. *Id.* "[T]he evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity," *id.*, and the requisite *mens rea* may "be inferred from the facts and circumstances surrounding the homicide." *Ewing*, 36 A.3d at 844.

With respect to Bryant, we conclude that the jury could permissibly infer from the facts presented that appellant had the requisite *mens rea* to sustain his conviction

for first-degree premeditated murder. There was ample evidence that Bryant formed the specific intent to kill Jimenez prior to the shoot-out on Gresham Place. The government offered evidence that Bryant attended that festival with a gun and with the knowledge that the festival was in Jimenez's neighborhood and "Hobart" territory. Moments before the shoot-out, Bryant attempted to provoke Jimenez through the statement "tell your man we trying to work," and by "pump faking," on the corner of Gresham Place and Sherman Avenue, indicating to Jimenez that he was carrying a gun. Additionally, in light of the gang affiliation evidence proffered by the government, Bryant had a motive to kill Jimenez due to the existing rivalry between CTU and 11th Street/Hobart neighborhoods. By arriving at the festival armed and by engaging in conduct that indicated that they were there to engage Jimenez in a violent altercation, Bryant's conduct supports a reasonable inference that he had the requisite intent to support the premeditation and deliberation requirements of first-degree murder. Thus, viewing the evidence in the light most favorable to the government, there is sufficient evidence from which a reasonable jury could find that appellant Bryant acted with the premeditated and deliberate intent to kill Jimenez and acted with provocation. *See Frendak v. United States*, 408 A.2d 364, 371 (D.C. 1979) (appellant's carrying of a gun to the scene of the murder, viewed in conjunction with the entirety of her premeditated actions, which included following the victim prior to the shooting and the position in which the

victim was shot, substantiated an inference of premeditation and deliberation). We, therefore, conclude that there was sufficient evidence on which a reasonable jury could find that Bryant had the required *mens rea* to be convicted of first-degree murder.[5]

## F. Severance

Before trial, in an oral motion, appellant Bush moved to sever his trial from that of Bryant. The motion was denied by the trial judge, who stated the defendants were properly joined under the urban-gun-battle theory, but that he would revisit the issue of severance if unfair prejudice from joinder arose at trial. During trial, Bush renewed his motion to sever.

We review the denial of a motion to sever for abuse of discretion. *See Sams v. United States*, 721 A.2d 945, 954 (D.C. 1998). In order to show that severance is warranted, appellant must show that manifest prejudice resulted from the joinder of his case with that of his co-defendant. *Id.* (internal quotations omitted); *see Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[M]anifest prejudice is a serious risk

---

[5] Appellant Bush does not challenge the sufficiency of the government's evidence of first-degree murder on appeal.

that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.").

Appellant Bush asserts that he suffered manifest prejudice due to the admission of the gang affiliation evidence, which focused almost entirely on Bryant's conflict with Jimenez and Hobart, and the evidence of provocation against Bryant. Given the presumption that joinder is proper where appellants "are alleged to have participated in the . . . same series of acts or transactions," *Medley v. United States*, 104 A.3d 115, 122 (D.C. 2014), and the limiting instruction provided to the jury to consider the evidence against each defendant independently and not to allow their verdict against one defendant to affect their verdict as to the co-defendant, appellant has failed to convince us that severance was warranted in this case. Bush's participation in the shoot-out was not *de minimis*, as there was evidence presented that he was with Bryant during the entire time that Bryant was engaged in hostile acts towards Jiminez and that he fired the first shot. Further, the evidence presented was not "so complex or confusing that the jury would [have been] unable to . . . make individual determinations about the guilt . . . of each defendant." *See Hargraves v. United States*, 62 A.3d 107, 116 (D.C. 2013). Accordingly, the trial court did not abuse its discretion by denying appellant's motion to sever his trial from that of Bryant.

**III.**

For the aforementioned reasons, the trial court's judgment is

*Affirmed.*